SMS DATA PRODUCTS GROUP,
INC., Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 87–1444.

United States Court of Appeals,
Federal Circuit.

July 29, 1988.

Forrest A. Hainline, III, Swidler & Berlin, Washington, D.C., argued for appellant. With him on the brief was Sherrie Kopka Kennedy.

Jonathan S. Baker, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Mary Mitchelson, Asst. Director. Also on the brief was Dalton Phillips, Office of the Gen. Counsel, Dept. of Health and Human Services, Washington, D.C., of counsel.

Before RICH and SMITH, Circuit Judges, and BALDWIN, Senior Circuit Judge.

RICH, Circuit Judge.

This appeal is from a decision of the General Services Board of Contract Appeals (GSBCA or board), which denied a protest filed by SMS Data Products Group, Inc. (SMS). SMS protested the award of a contract for automatic data processing (ADP) equipment to Severn Companies, Inc. (Severn), on the basis that the contracting officer's decision to exclude SMS from participating in the reprocurement through which the contract was awarded violated various procurement statutes and regulations. The board denied SMS's protest because it concluded that the contracting officer's decision to exclude SMS from the reprocurement was reasonable and not inconsistent with procurement rules and regulations. We reverse and remand with instructions.

I.

A. *The Initial Solicitation*

On June 30, 1986, the Department of Health and Human Services (HHS) issued Solicitation No. 282–86–0060 for ADP equipment, with the purpose of procuring "multiuser, multitasking computer systems for the Indian Health Service [IHS] Area Offices, Service Units, Hospitals, facilities, and Tribal/638 contracted health care facilities," to be located "throughout the United States."

Section C.1 of the solicitation set forth twenty-four pages of "Mandatory Specifications." The Mandatory Specifications called for three computer systems, denoted "A", "B", and "C", each to consist of a central processing unit (CPU), and more or less peripheral equipment, depending on the system. Section C.1.2.1.6 required that "[e]ach system proposed shall be based on a minimum sixteen (16) bit CPU architecture." During negotiations, one offeror requested the government to modify the solicitation to require, at a minimum, a thirty-two bit processor, "in order to provide a CPU architecture with the flexibility, power, and growth potential to handle" IHS's needs. The government did not concur with the recommended change, and, in a tersely worded response, maintained that a sixteen bit CPU would meet its requirements.

B. *The July 29th Acceptance Test*

The original solicitation made no mention of a post-award acceptance test. During negotiations, however, the government stated that successful completion of post-award acceptance tests was "required," and in an amendment to the solicitation, a section E.1.1.1 was added, entitled *Post-award Acceptance Test*, which read in part:

> Successful completion of post-award acceptance tests is required. These tests will involve the execution of MUMPS applications programs and File Manager retrievals against a psuedo-patient data base, containing multiple types of demographic and medical data, of approximately 2500 patients.

Section E.1.1.1 also stated that various items necessary to run the tests and evaluate the results would be made available to interested offerors.

These items were made available in the form of the July 29, 1986 RPMS Acceptance Test. The test description explained:

*The purpose of this document is to specify mandatory levels of system performance* as measured by a series of acceptance tests.

\* \* \* \* \* \*

The acceptance test consists of a number of timed applications running concurrently on the proposed computer system. Timing results are computed by the computer and displayed at the end of each task. [Our emphasis.]

Each system was to be tested, and the systems were required to complete each task within a specified average elapsed time, or response time.

### C. *The Award to SMS*

On September 29, 1986, the contracting officer wrote a file memorandum on the course of the procurement which concluded:

[I]t was determined that the offer submitted by SMS Data Products Group, Inc., was the offer most advantageous to the Government. As SMS had the lowest evaluated cost, submitted an acceptable technical proposal, and received a weighted evaluation score of 2.10 points higher than the next highest offeror, it was determined that negotiation would not result in a more advantageous offer.

In accordance with this conclusion, the contract was awarded to SMS on the following day.

### D. *The C3 Protest, the Stipulation and Agreement, and the November 24, 1986 Acceptance Test*

C3, Inc. protested the award to SMS in the GSBCA, and SMS, Severn, and Computer Marketing Corporation (CMC), joined in the protest as intervenors. HHS was the named respondent.

On November 14, 1986, C3's protest was dismissed without prejudice pursuant to a Stipulation and Agreement to which SMS was not a party. The gist of the Stipulation and Agreement was that the government was obligated to create an enhanced acceptance test to administer to SMS, which was to include at a minimum certain items stated in an attachment to the document. If SMS failed the enhanced acceptance test, it was to be placed in default and

the contract awarded to the next highest ranked offeror without any further negotiations, discussions, or opportunity for best and final offers. The acceptance testing procedures would then begin anew. The Stipulation and Agreement provided in part:

2. Upon receipt of the Board's Order and Dismissal approving this Stipulation and Agreement, Respondent shall prepare an Acceptance Test Plan pursuant to Section E.1.1.1. of Solicitation No. 282–86–0060....

3. The Acceptance Test Plan shall test fully configured and fully operational Type A, B and C systems to insure that the offered systems fully comply with the mandatory requirements of the Solicitation.... As a minimum the Acceptance Test Plan shall include the Test requirements set forth in Attachment A hereto. ["Attachment A" set forth three pages of "changes and additions" to the original acceptance test.] The tests shall be performed within the time limits provided for in Section E.1.1.1, of the Solicitation.

4. ... The[ ] systems to be tested by SMS shall be the same specific systems proposed by SMS ... without change or alteration to model number, memory capacity or any other hardware, software or firmware feature or function as contained in the original SMS proposal accepted by Respondent.

The reference in paragraph 3 to "the time limits provided for in Section E.1.1.1." is significant because Section E.1.1.1 itself contained no limits, but merely referred to "maximum acceptable response times" to be provided upon request. These time limits were issued as part of the July acceptance test. Thus, the new tasks in the revised test were to be performed in the same amount of time allotted in the July test.

In accordance with the Stipulation and Agreement, HHS prepared an acceptance test dated November 24, 1986. The provisions added as a result of the settlement appeared for the most part in Section 2.6 of the November test. The changes in the test scenario were substantial. For exam-

ple, the July test contained a timed test to be run on the A system in which a series of repetitive tasks were to be carried out concurrently on eighteen terminals connected to the CPU. The November version contained a similar test, but increased the number of terminals to twenty-two without allowing any added response time. Also, other peripheral equipment was added so that in the case of the November test, thirty-two input/output ports on the CPU would be in use instead of only eighteen in the case of the July test.

The change in the test scenario was an important factor which led to a decision by SMS to perform the acceptance testing on a dual 16–bit processor configuration, in contrast to the single 16–bit processor solution which SMS had initially proposed. Howard Sutphin, SMS's vice-president for technical operations, testified on this point:

> Q. ... Why did you decide to test the dual P–20 [16–bit processors] in Albuquerque?
>
> A. The decision was made when the expanded requirements of the November acceptance test came to my attention and the technical team's attention at SMS, and we elected to abandon that effort and proceed with something more powerful.
>
> Q. Why, precisely?
>
> A. It was very simply the fact that the expanded requirements which are mandatories in Section C in a timed environment would be beyond the scope of the single P–20.
>
> Q. What was the critical difference between the November test and the July test that made you make that decision?
>
> A. The additional test conditions that are pretty much outlined in Attachment A of the stipulation and agreement in a timed environment.

Robert Woodward, SMS's senior vice-president, testified to the same effect.

The acceptance testing was detailed and extensive in nature. The contracting officer's November 24, 1986 letter to SMS contained a description of the various tests which runs to thirteen typed pages. Similarly, the evaluation form used during the actual testing is twenty-seven pages in length. Testing began in Albuquerque on January 6, 1987, and was not completed until January 21.

### E. *SMS's Termination for Default*

On January 22, 1987, the project officer wrote a memorandum to the contracting officer. The memorandum reported nine findings on the acceptance testing and ended with a request that SMS be placed in default because, as shown by the acceptance testing, SMS's equipment did not meet the mandatory requirements of the contract. The project officer's main complaint, reflected in several findings, was the complexity of SMS's dual processor solution. The project officer also found that "[t]he type A system was unable to meet the timing requirements of Section 2.6 of the Acceptance Test Procedures."

After receiving the project officer's memorandum, the contracting officer sent a cure notice to SMS dated February 5, 1987. The items listed in the cure notice generally corresponded to the findings in the project officer's memorandum. Conspicuously, however, SMS's failure to pass the timed portion of the test was not mentioned. The notice closed with the admonition that SMS would be placed in default if it did not cure the listed problems within 10 working days.

SMS responded to the cure notice on February 10, in a letter which addressed each deficiency and proposed a solution along the lines of the dual processor system which SMS had tested. A meeting with HHS representatives followed. Then a second letter from SMS, dated February 18, offered a different cure using a single 32–bit processor for each application:

> SMS understands that IHS prefers a single processor for each configuration available under the contract. SMS also understands that IHS wants a 68020 based [i.e., 32–bit] CPU as well as a processor that has the ability to expand from an eight (8) port machine to one that has over 32 ports. Although these items are not required by the contract or specifications, SMS is willing to provide them.

In order to meet IHS' actual needs and resolve not only those matters expressed in the Agency's Cure Notice, but its real concerns as expressed in our meeting of February 11, 1987, SMS proposes to deliver and install the 68020 based Plexus P/55 basic systems for the "A", "B", and "C" systems. The details of this offer will be outlined in a proposal that SMS will send to IHS under separate cover.

SMS received a response two days later, in the form of a notice of termination for default, which read in part:

As of February 20, [the last day of the cure period,] no attempt was made to install or perform the acceptance test. Instead, you [i.e., SMS] delivered a box containing an entirely new proposal. The proposal claims you will deliver the Plexus P/55 computer system and the Printronix S7024 printer. You state that this equipment will meet all mandatory requirements set forth in the contract; however, according to your February 18 letter you do not plan to perform the acceptance test as you agreed to do on our February 10, 1987 meeting, and as is provided in the contract. The Government cannot accept your word, without testing, that this new proposal will meet the mandatory requirements.

Accordingly, your proposed cure is unacceptable and your right to proceed further under the subject contract is terminated for default....

### F. *The Reprocurement*

The contracting officer initiated the reprocurement on February 24, 1987 with a letter to SMS regarding mitigation of damages. She stated:

In order for the Government to be entitled to excess reprocurement costs, we must allow you the opportunity to mitigate your damages. Therefore, if the proposal you submitted to our office on February 20 is still valid, please provide us with a letter, no later than March 3, stating that your offer is still open.

SMS subsequently assured the contracting officer that its February 20 offer remained open at the prices specified in SMS's initial contract.

Then, on February 26, letters were sent to Severn, CMC, and C3. Those to CMC and C3 noted that certain aspects of their proposals did not meet the mandatory requirements and suggested that their proposals be revised. All three letters contained this paragraph:

As you know, in its opinion dismissing the protest of C3, the GSBCA ordered that the conduct of any reprocurement be in accordance with applicable procurement rules, regulations and statutes. Accordingly, pursuant to established procurement rules, the Government has the right to assess excess reprocurement costs against the defaulted contractor, who has to be allowed to mitigate its damages by the offer of conforming equipment within a reasonable period. Should SMS make such an offer, the Government would be obligated to accept in order to preserve its right to excess costs. *See Spectrum Leasing Corporation*, ASBCA No. 25724, 26049, 85–1 BCA 17,822. Consequently, in the reprocurement of RFP Number 282–86–0060, the Government is unable to limit competition to the Protestor and the Intervenors, as provided in the Stipulation and Agreement.

Severn requested a meeting to discuss these letters. When the contracting officer refused, Severn wrote on February 27 to express its "disbelief and outrage" with HHS's actions. The letter stated that the contracting officer's course of action was "so far afield of the process of reprocurement as to be ludicrous," and continued:

By establishing a procedure whereby C3, CMC, Severn and SMS may revise their proposals and offer different costs and equipment, you are conducting a prohibited auction. All vendors participating in the reprocurement are aware of each others' costs as well as the equipment bid, due to the GSBCA protest and resultant discovery....

We further cannot believe the precedent HHS is setting if it continues the reprocurement process in this manner. What you propose is that a vendor can provide deficient and non-conforming equipment, and if defaulted, can then

revise his offering to reflect totally different equipment and be re-awarded the contract. HHS is allowing SMS to be awarded a contract in a reprocurement action taken as a result of their own default.

The letter closed with a "demand" for "immediate action in withdrawing the 26 February letters sent to SMS, C3, CMC and Severn, and reprocuring in a manner consistent with the Stipulation and Agreement."

On March 10, 1987, apparently ignoring Severn's demand, the contracting officer requested the project officer to prepare a technical evaluation of SMS's proposal.

That same day, the contracting officer met with representatives of Severn. In a follow-up letter to HHS on March 13, Severn's vice-president commented that "[t]his whole process has been very enlightening to say the least," and requested clarification of a point raised at the meeting:

> During the meeting, you and Mr. Dalton Phillips indicated that although SMS Data Products was unsuccessful in passing the timed portion of the expanded acceptance test, this was not a reason for the contract being defaulted. We understood you to say that it was the Government's opinion that a contractor could not be placed in default for not meeting a requirement that was never a part of the original contract.
>
> If I have correctly interpreted your explanation to mean that the timings of the expanded acceptance test were not used to determine whether or not the offeror's system was acceptable, I would appreciate your concurrence. Certainly, if I am wrong in my interpretation, I would equally appreciate your clarification.

The contracting officer later testified on this topic as follows:

> Q. Did you ever have a conversation with Severn about whether Severn should be tested under [Section] 2.6 [of the November test] with the timings of the initial acceptance test?
>
> A. Severn will be tested with the timings.

> Q. Did you ever have any discussion with Severn about that timing?
>
> A. Yes; we did.
>
> Q. Didn't you tell Severn that they would not be defaulted if they failed 2.6 with the timings of the original acceptance test?
>
> A. That's correct, because SMS was not defaulted on that basis.
>
> . . . .
>
> Q. Did you ever tell SMS that they would not be defaulted for failing 2.6 in a timed environment?
>
> A. No; I did not.

From this testimony it is clear that, at least at the start of the acceptance testing, SMS had every reason to believe that its equipment would be required to pass the timed tests of Section 2.6.

After the meeting with Severn, the reprocurement quickly moved to a close. The contracting officer's request for a technical evaluation of SMS's proposal was never carried out because the project officer flatly refused to do the evaluation. The contracting officer did not question this decision but simply asked for it to be put in writing, which she received on March 18 in the form of a letter drafted by the project officer and signed by the Director of IHS. That same day, the contracting officer wrote to CMC and C3 to rescind her letters of February 26, and announced that the contract would be awarded to the second highest ranked offeror, Severn, who had bid a single 32–bit processor. The contracting officer characterized this method of reprocurement as "consistent with the Federal Acquisition Regulations" and "not [in] conflict with the Stipulation and Agreement." SMS was sent a letter stating that it was not in the government's best interest to accept SMS's proposal and that the contract would be awarded to Severn. The actual award to Severn was made two days later, on March 20, 1987. SMS then protested the award to Severn in the GSBCA.

### G. The Board's Opinion

The board defined the issue before it as whether SMS was rightfully excluded from

the reprocurement. The board then stated that the validity of SMS's complaint was best assessed by a review of what in fact had transpired in the procurement. The board explained that the initial procurement was a full and open competition, subject to no competitive restrictions. As to events occurring after the award to SMS, the board repeatedly stressed that although it would make a limited number of findings of fact, it had no intention "of determining whether the termination for default was proper or whether the enhanced acceptance test standards ultimately exceeded the limits of the original contract." The board then reviewed the post-award events and explained that, regardless of the propriety of the termination for default, the contracting officer was left with little confidence in SMS. SMS's contention that Severn had intimidated the contracting officer was rejected as unproved. The board then held "that the decision of the contracting officer to eliminate SMS from further competition on the reprocurement was a reasonable and rational one, independently arrived at after due consultation and reflection." The board also concluded, in a portion of its opinion to which we will return, that the contracting officer's actions were "not inconsistent with the requirement either for full and open competition or for maximum practicable competition." SMS's protest was denied.

## II.

The Federal Acquisition Regulations (FAR) were revised to conform with the Competition In Contracting Act, Pub.L. No. 98–369, 98 Stat. 1175 (1984)(CICA), shortly after the CICA became law. As a result of this revision, subsection (b) of 48 CFR § 49.402–6, entitled "Repurchase against contractor's account," now reads:

(b) If the repurchase is for a quantity not over the undelivered quantity terminated for default, *the Default clause authorizes the contracting officer to use any terms and acquisition method deemed appropriate for the repurchase. However, the contracting officer shall obtain competition to the maximum extent practicable for the repurchase.* The contracting officer shall cite the Default clause as the authority. If the repurchase is for a quantity over the undelivered quantity terminated for default, the contracting officer shall treat the entire quantity as a new acquisition. [Emphasis added.]

This case requires us to decide the correctness of the GSBCA's decision that the contracting officer obtained competition "to the maximum extent practicable" for the reprocurement of computer systems for HHS.

In deciding this question, we recognize that an agency's construction of its own regulations is entitled to substantial deference. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). In this case, however, there is no settled construction of this recently revised regulation. In its initial opinion denying motions of HHS and Severn to dismiss SMS's protest, the board explained:

The language regarding competition was a new element introduced into the FAR by Federal Acquisition Circular Number 84–5 which was issued on December 20, 1984, and contained changes to the FAR to conform the regulation to the CICA. 50 Fed.Reg. 1745 (1985). The degree of competition required for the reprocurement which is the subject of this protest is an issue very much open to question and will undoubtedly turn to some extent on the factual situation which actually obtained at the time of the reprocurement.

Thus, the board itself recognized that the meaning of this revised regulation "is an issue very much open to question."

Since we have no established interpretation of § 49.402–6, we look first to the plain meaning of its language. As one would expect, use of the word "shall" in the phrase "shall obtain competition to the maximum extent practicable" denotes the imperative. *See* 48 CFR § 2.101 (definition). As to the word "practicable," in common usage it means "possible to practice or perform," or "capable of being put into practice, done, or accomplished: feasible." Webster's Third New International

**1554**

Dictionary (1971). Thus, the contracting officer did not have unbridled discretion in conducting the reprocurement, but was required to conduct the reprocurement in the most competitive manner feasible. Finally, "competition" has many meanings; of those, "the effort of two or more parties to secure the custom of a third party by the offer of the most favorable terms," *id.*, seems most reasonable in the context of this regulation.

A second guide to the meaning of the regulation is the statutory scheme pursuant to which it was promulgated. The Competition in Contracting Act was "designed to increase the use of competition in Government contracting and to impose more stringent restrictions on the awarding of noncompetitive—sole-source—contracts." H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1421, *reprinted in* 1984 U.S. Code Cong. & Ad. News 697, 1445, 2109. The Conference agreement on CICA rejected "effective" competition as too low a standard for government procurements, and instead substituted "full and open" competition as the standard, "to emphasize that all responsible sources are permitted to submit bids or proposals for a proposed procurement." H.R.Conf.Rep. No. 861 at 1422, 1984 U.S.Code Cong. & Ad.News 2110. Indeed, "full and open competition" "means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." 10 U.S.C. § 2302(3); 41 U.S.C. § 403(7) (Supp. III 1985). Thus, our view that the revised § 49.402–6 limits the contracting officer's discretion in repurchase situations is consistent with CICA's purpose of imposing stringent restrictions on the use of noncompetitive procurement procedures in government contracting.

Even with this understanding, however, there is obviously a large degree of ambiguity in a phrase such as "shall obtain competition to the maximum extent practicable," which can only be given concrete meaning through a process of case-by-case adjudication. *Cf. I.N.S. v. Cardoza–Fonseca,* 480 U.S. 420, ___, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). The board recognized this when it stated that the degree of competition required for the repro-

curement would "undoubtedly turn to some extent on the factual situation which actually obtained at the time of the reprocurement." We agree. Under § 49.402–6, it was particularly important for the board to consider *all* the relevant facts and circumstances in reviewing the propriety of the contracting officer's conduct of the reprocurement.

### III.

At the core of the board's decision denying SMS's protest was a focus upon what the board characterized as the "unchanged specifications" of SMS's contract. After discussing the technical nature of the decision to exclude SMS from participating in the reprocurement, the board stated:

In addition, under the particular circumstances which obtain in this case, the return to the original competitive range is not inconsistent with the requirement either for full and open competition or for maximum practicable competition. *The underlying mandatory specifications were not altered* and offerors initially were free to propose whatever solution they thought best. The protester's solution did not work and thus the contracting officer moved on to the next in line [i.e., Severn]. The contracting officer chose not to permit revised proposals—a determination properly within her discretion. She did not abuse that discretion given the competition achieved *on the basis of the unchanged specifications.* Had she not excluded the protester, she would have been required in fairness to permit all offerors within the competitive range, and perhaps others, to revise their proposals and to establish a new competitive range. We find insufficient basis for requiring such action in this case. [Emphasis added.]

Thus, a key factual premise of the board's decision was that the underlying specifications of SMS's contract were not altered by the Stipulation and Agreement.

It is true that the Stipulation and Agreement did not affect the underlying specifications of SMS's contract, but this unveils only half the story. The other half of the

story is found in the method of acceptance testing. The July acceptance test was changed after the award to SMS as a result of the Stipulation and Agreement, and the board's opinion contains no less than fifteen references to the resulting November acceptance test as "special," "enhanced," "revised," and containing "additional" test procedures. To cite only one example, the board found as a fact "that respondent, Severn, CMC and C3 ... enter[ed] into a settlement agreement which called for acceptance testing beyond that called for in the original contract acceptance test."

We think the board erred in its analysis because it failed to take into account the substitution, after the award to SMS, of the more difficult November acceptance test for the July version. After the settlement of the C3 protest, HHS's position was that a successful offeror would have to pass the November acceptance test. When the contracting officer defaulted SMS and began the reprocurement process, offerors may reasonably have concluded that the necessity of passing the more difficult acceptance test resulted in a situation where it would have been prudent, under these changed circumstances, to revise their proposals to be more favorable to HHS. Therefore, the change to the November acceptance test was relevant to whether the contracting officer's refusal to permit such revisions met the standard of competition to the maximum extent practicable. It begs the question to state merely, as the board did, that the underlying specifica-

tions remained unchanged. Therefore, we conclude that the board committed a legal error when it excluded the revision of the acceptance test from its analysis.*

## IV.

We now turn to explaining why we feel that when the revision of the acceptance test procedure is taken properly into account the board's decision must be reversed.

We begin with the description of the July acceptance test, which stated that "[t]he purpose of this document is to specify mandatory levels of system performance as measured by a series of acceptance tests." This language is important. It does *not* say that the purpose of the tests is to check for compliance with the mandatory requirements or specifications found in Section C of the contract. Rather, this statement of purpose clearly envisions that the acceptance test, in and of itself, "specif[ies] mandatory levels of system performance." We have carefully reviewed the mandatory requirements specified in Section C of the contract, and both the July and November acceptance tests and conclude that this statement of purpose accords with reality. In effect, the timed portions of the July and November acceptance tests established performance specifications in addition to those found in Section C on mandatory requirements.

An independent basis for our conclusion is found in *Southwest Welding & Mfg. Co.*

---

* The board's opinion reflects that its hesitation to confront this issue head on may have resulted from a concern that the board would be making a *de facto* determination of the propriety of SMS's termination for default, which is an issue outside the board's CICA protest jurisdiction. Such a concern was not merited. Subject matter jurisdiction is a concept which relates to the power of a tribunal to adjudicate a particular controversy. *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 793, 105 S.Ct. 1620, 1634, 84 L.Ed.2d 674 (1985); *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168, 60 S.Ct. 153, 154–55, 84 L.Ed. 167 (1939). Implicit in Congress' grant to the board of the power to decide bid protest controversies in ADP cases is the power to make all findings of fact and conclusions of law necessary to reach a reasoned decision. That a particular finding or conclusion may have some bearing on a differ-

ent controversy outside the board's protest jurisdiction is irrelevant. The board's approach may also have been colored by the fact that, in the past, this Court had construed Congress' grant of jurisdiction to the board narrowly. *See Electronic Data Systems Federal Corp. v. GSBCA*, 792 F.2d 1569 (Fed.Cir.1986). The board's jurisdiction, however, has recently been expanded by an amendment to the Brooks Act. *See* 40 U.S.C. § 759(f), *as amended by* Paperwork Reduction Reauthorization Act of 1986, Part B—Amendments to the Brooks Act, H.R.Conf.Rep. No. 1005, 99th Cong., 2d Sess. 359 (1986). The Conference report makes clear "that expanded authority has been placed in the Board, whose jurisdiction and functions shall be broadly construed so as to effectuate the purposes underlying the original grant of protest jurisdiction to it." H.R.Conf.Rep. No. 1005 at 778.

v. *United States*, 413 F.2d 1167 (Ct.Cl. 1969). In *Southwest Welding*, the Court of Claims held that under the circumstances of that case, certain "unusually stringent" testing and inspection requirements which were "set forth in great detail," "established, in effect, the performance standard to which the contractor was obliged to adhere." The Court of Claims also explained that "[t]he tests specified to determine compliance with contract requirements, and the contract requirements, constitute an equation." *Southwest*, 413 F.2d at 1183 (footnote omitted). We think that in this regard the instant case is similar to *Southwest*. While the July and November acceptance tests must be read together with the contract specifications or requirements to be meaningful, it is undeniable that the timed acceptance tests established performance standards or specifications having no counterpart in the contract specifications. In addition, the November test established a more difficult performance standard than the July test.

Under these circumstances, the contracting officer's method of reprocurement cannot be said to have met the standard of competition to the maximum extent practicable required by 48 CFR § 49.402–6(b). The first half of the inquiry, which we have already touched on, is whether the contracting officer could have conducted the reprocurement to achieve a greater degree of competition. In the end, the contracting officer's method of reprocuring was to award the contract to the next highest ranked offeror without any further negotiations, discussions, or request for best and final offers. The November acceptance test, however, injected a performance specification into the reprocurement which was not present in the initial procurement. Despite the contracting officer's statement to Severn that Severn would not be required to pass the timed portion of the November test, Section 2.6 remained in the test, and the contract expressly stated that successful completion of post-award acceptance testing was "required." There was no guarantee that offerors other than Severn would be told in advance that they would not have to comply with the timed portions of the acceptance test. Thus, in view of the performance specification added in the November test, offerors within the competitive range may have desired to revise their proposals to be more favorable to the government. For example, offerors may have wished to offer 32–bit processors instead of the 16–bit processors which the great majority of offerors proposed initially. Therefore, the contracting officer could have achieved a significantly higher degree of competition by permitting revised proposals, regardless of whether she decided to establish a new competitive range. The second half of the inquiry is whether such a course would have been practicable under the circumstances. We conclude that it would not have been impracticable for the contracting officer to conduct further negotiations because a competitive range had only recently been established, some negotiations had already occurred, and there was no compelling urgency to procure this equipment. Thus, the reprocurement was not conducted to obtain competition to the maximum extent practicable.

## V.

The board's decision is reversed and SMS's protest is granted. In its request for relief, SMS requests the Court to direct HHS to terminate its contract with Severn and to award the contract to SMS. Because our decision is that the reprocurement did not meet the requisite standard of competition, and not that the contract should have been awarded to SMS, we decline to direct that the contract be awarded to SMS. Instead, we remand this case to the board with the following instructions. The CACI provides that a contract is presumed valid as to all goods delivered and accepted before a decision granting a protest on its merits is issued. *See* 40 U.S.C. § 759(f)(6)(B). On remand, the board is to determine to what extent Severn has performed on its contract with the government. To the extent that there are computer systems that Severn has yet to deliver, or that the government has yet to accept, the board shall order that Severn's contract be terminated for convenience and HHS's acquisition authority for the contract be revoked to that extent. We also

instruct that for the purpose of an award of proposal and protest costs, SMS shall be deemed to have prevailed in these proceedings. The board's decision is, therefore, *reversed* and the case is *remanded* for further proceedings in accordance with this opinion.

REVERSED AND REMANDED.