**SMS DATA PRODUCTS GROUP, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 361–88C.

United States Claims Court.

May 11, 1989.

Forrest A. Hainline, III, Washington, D.C., for plaintiff.

Jeanne A. Anderson, Washington, D.C., with whom was Asst. Atty. Gen., John R. Bolton, for defendant.

## OPINION

RADER, Judge.

This case revisits issues recently litigated before the General Services Administration Board of Contract Appeals (GSBCA or Board) and the United States Court of Appeals for the Federal Circuit. *SMS Data Prods. Group, Inc. v. United States*, 853 F.2d 1547 (Fed.Cir.1988). In 1986, the Government awarded plaintiff, SMS Data Products Group, Inc. (SMS), a contract for computer services. Before performance, the Government terminated the contract for default of SMS. The Government later excluded plaintiff from the new procurement for the same services.

Plaintiff challenged the exclusion before the GSBCA. GSBCA denied the claim. On appeal, the Federal Circuit reversed the GSBCA. The Federal Circuit ruled that the Government wrongfully excluded plaintiff from the reprocurement and ordered termination of the new contract. The Federal Circuit corrected the Government's wrongful exclusion of plaintiff from reprocurement bidding.

The Federal Circuit case, however, did not challenge the propriety of the initial default termination. In this action, pursuant to 41 U.S.C. § 609(a)(1) (1982), the plaintiff asks the court to convert the termination for default to termination for convenience of the Government.

According to plaintiff, the Federal Circuit established the key facts showing the impropriety of the Government's default termination. Defendant contends that the Federal Circuit did not consider the merits of the default termination. Further, defendant argues that the Department of Health and Human Services (HHS) had good reason to terminate plaintiff's original contract.

This court received this case by assignment on October 17, 1988. On November 14, 1988, plaintiff moved for partial summary judgment. Defendant responded with a cross-motion for summary judgment and opposition to plaintiff's motion. After argument, this court grants plaintiff's motion.

## FACTS [1]

On September 29, 1986, (HHS) awarded plaintiff a contract to provide computer services to the Indian Health Service (IHS). IHS intended to use the computer system in area offices located around the United States. The contract contained lengthy specifications for the function and design of the data processing equipment.

The original solicitation, however, did not require bidders to perform a post-award test. Nonetheless, during negotiations, the Government amended the solicitation to include successful completion of a post-award performance test.[2] This test, announced in July, required the computer system to process concurrently several timed exercises. This test, in effect, became part of the contract.[3]

---

1. This court adopts the facts as set forth by the Court of Appeals for the Federal Circuit in *SMS Data Prods. Group, Inc. v. United States*, 853 F.2d 1547 (Fed.Cir.1988). Defendant, however, asks this court to "review the actual record of facts before the board to reach its own conclusions concerning the November acceptance test and the propriety of the default termination." Def. Brief filed Jan. 18, 1989, at 10–11. Therefore, this court also cites relevant portions from its review of the Board's record in support of these facts.

2. HHS issued the original solicitation on June 30, 1986. A month later on July 29, 1986, HHS issued the July acceptance test.

3. The title of Section E of the contract was "Inspection and Acceptance." Clause E.1.1.1, entitled "Post-award Acceptance Test," required successful completion of performance tests. The sole post-award performance test under consideration at the time of the contract execution in September was the July test. During proceedings before the Board, the contracting

At this point, HHS awarded plaintiff the contract.[4] C3, Inc., an unsuccessful solicitor, protested the contract award.[5] Severn and Computer Marketing Corporation (CMC) joined in the GSBCA action as intervenors. SMS also intervened to protect its interests. *SMS Data*, 853 F.2d at 1549. The named respondent was HHS.

On November 14, 1986, HHS entered into a Stipulation and Agreement with the protestors and dismissed their protest without prejudice. The Stipulation and Agreement excluded SMS.[6] *MSM Data*, 853 F.2d at 1549. The Federal Circuit described the terms of the Stipulation and Agreement:

> The gist of the Stipulation and Agreement was that the government was obligated to create an enhanced acceptance test to administer to SMS, which was to include at a minimum certain items stated in an attachment to the document. If SMS failed the enhanced acceptance test,

it was to be placed in default and the contract awarded to the next highest ranked offeror without any further negotiations, discussions, or opportunity for best and final offers.[7]

*Id.* at 1549. Thus, without SMS's participation or consent, HHS devised a new acceptance test. This new test, announced in November, required plaintiff to perform complex new tasks under the same time restraints included in the July test. *Id.*

The November acceptance test significantly altered the terms of the July test. *SMS Data*, 853 F.2d at 1556. For example, the November test required SMS to perform tasks simultaneously on twenty-two terminals; the July test covered only eighteen terminals. The November test also required concurrent use of thirty-two input/output ports; the July test only used eighteen. Moreover the new test employed the same stringent time limits as the prior

officer confirmed that this test was part of the contract:

> Q: First, I'm handing you F–2 to the Rule Four File. This was the acceptance test that the Government issued before SMS signed its contract; isn't it?
> A: That's correct.
> Q: This became part of the SMS contract?
> A: That's correct.

Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 37–38. The project manager reiterated the same understanding:

> Q: Was the July acceptance test part of SMS' contract?
> A: Yes, it was.

Transcript of Proceedings, GSBCA No. 8912–P, May 5, 1987, at 350. The Federal Circuit reviewed the contract and the terms of the July test:

> [The July test] statement of purpose clearly envisions that the acceptance test, in and of itself, "specif[ies] mandatory levels of system performance." We have carefully reviewed the mandatory requirements specified in Section C of the contract, and both the July and November acceptance tests and conclude that this statement of purpose accords with reality. In effect, the timed portions of the July and November acceptance tests established performance specifications in addition to those found in Section C on mandatory requirements.

*SMS Data*, 853 F.2d at 1555. The Federal Circuit further notes: "the July and November acceptance tests must be read together with the contract specifications or requirements to be meaningful...." *Id.* at 1556.

4. Plaintiff received a weighted score of 91.94 in the technical and cost evaluation. Severn, the next highest ranked competitor, scored 89.84. Pl. Brief filed Feb. 13, 1989, App. V, at 1209.

5. According to the testimony of Mr. E. Walter Wolford, contract manager, before GSBCA, Severn and C3 "wanted the acceptance test to be expanded to include the functioning of all 32 ports under a timed environment." Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 195.

6. According to Mr. Wolford, "the stipulation and agreement is by and large the suggestion of Mr. Litzinger [President of C3] and Mr. Steere [President of Severn]." Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 197.

7. Defendant argued that the purpose of the stipulation "was to show that the award was proper and to get on with the contract...." Transcript of Proceedings, No. 361–88C, Mar. 15, 1989, at 30. This argument overlooks that the stipulation changed plaintiff's contractual obligations and favored plaintiff's competitors:

> The Court: Why, then, did this stipulation agreement, if it was just to show that SMS was proper, why did it go on to specify who would get the award in the event of failure?
> Ms. Anderson: Well, I don't really know the answer to that. In the normal course of a procurement, when someone is kicked out of the competitive range, the next eligible highest bidder is going to get the contract anyway....

*Id.* at 30–31.

test. *Id.* at 1549. Without question, "the November Test established a more difficult performance standard than the July Test." *Id.* at 1556. In effect, HHS had unilaterally changed plaintiff's contract.[8] Nonetheless, HHS refused to permit SMS to change any "model number, memory capacity or any other hardware, software or firmware feature or function as contained in the original SMS proposal accepted by Respondent." [9] *SMS Data,* 853 F.2d at 1549.

In an effort to comply with the added demands, SMS elected to perform the November test with a dual 16–bit processor, rather than its original single 16–bit processor. The test ran from January 6 to January 21, 1987. On January 22, 1987, the project officer, E. Walker Wolford, recommended to Janet Miller, the contracting officer, that plaintiff be placed in default. The project officer complained that the dual processor system was too complex. In addition, the project officer cited plaintiff's failure to meet the timing requirements in the November Acceptance Test. *Id.* at 1550.

On February 5, 1987, the contracting officer sent plaintiff a cure notice. The cure notice gave SMS ten days to correct the listed errors or face default. The cure notice did not mention SMS's failure to pass the timed portion of the test.[10]

In a February 10, 1987 letter, SMS proposed solutions to each deficiency based on changes in the dual processor system. After a meeting with HHS, however, SMS offered on February 18 to replace, at the same price, the dual 16–bit processor with a single 32–bit processor:

> SMS understands that IHS prefers a single processor for each configuration available under the contract.... Although these items are not required by the contract or specifications, SMS is willing to provide them.

*SMS Data,* 853 F.2d at 1550. On February 20, HHS rejected plaintiff's "entirely new proposal" and terminated the contract for

---

8. In oral argument, defendant agreed that this court could conclude that HHS, in fact, changed the contract:

> The Court: If the Court understands your argument, you're willing to admit that the contract was changed by the November test and that there is at that point, and yet you go on to say that that wasn't the reason for the default. The default occurred for insufficiency of performance in matters totally unrelated to the change in the November test. Is that a fair summary?
>
> Ms. Anderson: That's correct except for just to be completely precise, the Federal Circuit stated that the November acceptance test was a change to the solicitation for the reprocurement. They didn't use the words "change to the contract" although that conclusion could be reached.

Transcript of Proceedings, No. 361–88C, Mar. 15, 1989, at 31–2. In addition, the contract manager knew that the Stipulation and Agreement effectively changed plaintiff's contract:

> Q: [A]t the time that you were having discussions with Mr. Steere about enhancing the acceptance test, was it your understanding that the July acceptance test had become part of the RFP?
>
> A: Certainly.

Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 195. The Federal Circuit, as noted earlier, concluded that the July and November tests "established performance specifica-

tions in addition to those found in Section C" of the contract. *SMS Data,* 853 F.2d at 1555.

9. Unlike the restrictions placed on SMS, plaintiff argues that HHS permitted Severn (winner of the reprocurement bid) to change its original proposal by doubling its system's main memory capacity. Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 42.

10. Defendant argues that HHS did not require plaintiff to comply with the timing requirements of the acceptance test. Transcript of Proceedings, No. 361–88C, Mar. 15, 1989, at 20–23. Clearly, however, the lack of timing compliance influenced the project officer's default recommendation. *SMS Data,* 853 F.2d at 1550. While it may therefore have influenced the contracting officer's default decision, the Federal Circuit did not consider that finding material to its decision. Instead the Federal Circuit concluded: "SMS had every reason to believe that its equipment would be required to pass the timed tests of Section 2.6." *SMS Data,* 853 F.2d at 1552. The Federal Circuit also cites testimony of the contracting officer establishing this point. *Id.* In this present action, the influence of timing compliance on the default decision is also not material. Regardless of whether the cure notice mentioned timing compliance, plaintiff, operating on the information supplied by HHS, made changes in its proposals and otherwise endeavored to comply with the timing requirements.

default.[11] HHS based its rejection on plaintiff's reluctance to perform another pre-award test and plaintiff's failure to cure the deficiencies noted on February 5 within ten days.

In a February 24 letter, the contracting officer offered SMS an opportunity "to mitigate [its] damages" by keeping its last offer of a 32–bit processor open. This action initiated the reprocurement process. Plaintiff responded that its February 20 offer was still open at its initial contract price. On February 26, 1987, the contracting officer invited Severn, CMC and C3, Inc. also to make new offers. The February 26 letter further stated:

> [T]he Government has the right to assess excess reprocurement costs against the defaulted contractor, who has to be allowed to mitigate its damages by the offer of conforming equipment within a reasonable period. Should SMS make such an offer, the Government would be obligated to accept in order to preserve its right to excess costs.

*SMS Data*, 853 F.2d at 1551.

Severn wrote back on February 27 demanding HHS's "immediate action in withdrawing the 26 February letters sent to SMS, C3, CMC and Severn, and reprocuring in a manner consistent with the Stipulation and Agreement."[12] After a meeting with Severn, the contracting officer wrote on March 18 to CMC and C3 to rescind the February 26 invitation to make new bids. On the same date, plaintiff learned by letter that its last offer was "not in the Government's best interest." Instead the contracting officer announced that the contract award would follow the Stipulation and Agreement procedure. Accordingly, on March 20, 1987, HHS awarded the reprocurement contract to the next highest ranked bidder—Severn. *Id.* at 1552.

Plaintiff filed a protest with GSBCA. The Board purported not to rule on "the propriety of the termination for default...." *SMS Data Prods. Group, Inc.*, 87–2 GSBCA (CCH) ¶ 19,920, 1987 WL 40983 (June 1, 1987) at 100,802. Instead GSBCA found HHS's decision to exclude plaintiff "from further competition to be well founded and not violative of any procurement statute or regulation...." *Id.* at 100,804. According to the Board, HHS's decision to exclude SMS from reprocurement was reasonable.

Upon appeal, the Federal Circuit reversed and ruled that any incomplete portion of the reprocurement contract with Severn should be terminated for convenience. *SMS Data*, 853 F.2d at 1556. According to the Federal Circuit, the Board "failed to take into account the substitution, after the award to SMS, of the more difficult November acceptance test for the July version." *Id.* at 1555. Therefore, GSBCA erred by excluding the revision of the acceptance test from its analysis.

In the present action, plaintiff contends that the Federal Circuit has already litigated the facts necessary to determine wrongful imposition of a termination for default. Plaintiff seeks application of the doctrine of collateral estoppel, or issue preclusion, to prevent reargument of whether the November test changed the contract. Plaintiff employs a partial summary judgment motion for this purpose.

Defendant filed a cross-motion for summary judgment asserting that the contract changes were not the cause of the default termination. Instead defendant contends that plaintiff did not comply with provisions of the contract unrelated to the change in pre-award tests.

This court must decide the effect of the Federal Circuit's rulings concerning HHS's

---

**11.** Plaintiff asserts that defendant did not even attempt to evaluate SMS's February 18 proposal. Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 41.

**12.** Severn responded by letter on February 27 with "disbelief and outrage." The letter criticized the contracting officer's conduct as "so far afield of the process of reprocurement as to be ludicrous." Severn objected to the possibility that SMS might "be awarded a contract in a reprocurement action taken as a result of their own default." *SMS Data*, 853 F.2d at 1551–52. Accordingly, Severn demanded that the reprocurement follow the procedure set forth in the Stipulation and Agreement, namely award to the next highest ranked offeror.

changes in pre-award testing requirements. Based on a review of the voluminous record, this court rules that the Federal Circuit decided the facts necessary to support plaintiff's motion for partial summary judgment.

## SUMMARY JUDGMENT

Both parties move for summary judgment under RUSCC 56(b). When no material facts remain in dispute, RUSCC 56 enables the court to resolve the entire case as a matter of law. Thus, a trial court may streamline the judicial process by isolating and disposing of factually unsupported claims or defenses.

Two recent Supreme Court cases—*Adickes v. Kress*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—set the standards for summary judgment proceedings. These cases establish the burdens to be borne by the movant and opponent of a summary judgment motion. *Adickes* governs the movant's obligations under the summary judgment rule. A movant for summary judgment has the "burden of showing the absence of a genuine issue as to any material fact...." *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

*Celotex* clarifies that *Adickes* does not require the movant to prove the absence of a factual dispute with respect to issues on which the nonmoving party bears the burden of proof. In such a case, the movant discharges its burden by showing an absence of evidence to support the nonmoving party's case.

*Celotex* obliges a party to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2553. Thus, a failure of proof concerning an essential element of the nonmoving party's case entitles the moving party to a legal judgment. *Id.* at 323, 106 S.Ct. at 2553.

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), requires this court to resolve doubts "in the light most favorable to the party opposing the motion." When evaluating the merits of the motions, the court must resolve reasonable factual disputes against the movant. *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981). Mere denials or conclusory statements, however, are not sufficient to create an evidentiary conflict. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984).

A material fact is one which will make a difference in the result of a case. *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Substantive law provides the basis to identify the material facts. Only disputes over facts that might affect the outcome of the suit will properly prevent an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## COLLATERAL ESTOPPEL

Plaintiff bases its case on an established legal principle. The Government has an implied obligation to refrain from willfully or negligently interfering with a contractor's performance. *Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir. 1988); *Peter Kiewit Sons' Co. v. United States*, 138 Ct.Cl. 668, 674, 151 F.Supp. 726, 731 (1957). Thus, according to plaintiff, the validity of HHS's determination to terminate plaintiff's contract for default hinges upon whether the November test imposed performance obligations on SMS beyond those contained in the September contract. The November test was a product of an HHS Stipulation and Agreement to which plaintiff was not a party. If the November test, in effect, changed the September contract, then HHS wrongfully placed plaintiff in default. Plaintiff argues that the Federal Circuit has already litigated and established this cornerstone fact. Thus, plaintiff contends that collateral estoppel prevents relitigation of that issue in this court. This court agrees.

The Federal Circuit has explained the doctrine of collateral estoppel:

> Under the doctrine of issue preclusion, traditionally called "collateral estoppel," issues which are actually and necessarily determined by a court of competent jurisdiction are conclusive in a subsequent suit involving the parties to the prior litigation.... The underlying rationale is that a party who has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again.

*Mother's Restaurant Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983). The Federal Circuit also articulated the requirements for the application of the doctrine:

> (1) [T]he issues to be concluded are identical to those involved in the prior action; (2) in that action the issues were raised and "actually litigated"; (3) the determination of those issues in the prior action was necessary and essential to the resulting judgment; and (4) the party precluded ... was fully represented....

*Id.* at 1569.

■ Defendant contests application of the doctrine of collateral estoppel. Defendant argues that the Federal Circuit case addressed only the competitive effect of the contracting officer's actions. Therefore, according to defendant, the Federal Circuit did not consider the propriety of the default termination. Moreover, defendant contends that the Federal Circuit did not actually and necessarily litigate the default termination issue.

*Identity of Issues*

In applying the first element of the test for collateral estoppel, this court must compare the issue before it with the issue already litigated. While the Federal Circuit litigated an issue different from the propriety of HHS's default determination, it nonetheless decided the cornerstone facts for resolution of this case. Upon a review of the record,[13] the Federal Circuit concluded that "the November test established a more difficult performance standard than the July test."[14] *SMS Data*, 853 F.2d at 1556. The Federal Circuit also determined that HHS prepared the new November test "[i]n accordance with the Stipulation and Agreement...." *Id.* at 1549. The Federal Circuit further decided: "In effect, the timed portions of the July and November acceptance tests established performance specifications in addition to those found in Section C on mandatory requirements." *Id.* at 1555. These determinations are among the cornerstone facts for this court's ruling.

Defendant's argument that the Federal Circuit ultimately decided a different issue is inapposite. Although the Federal Circuit did not ultimately decide the propriety of the default termination, it did decide the issue of whether the November test changed "'the performance standard to which the contractor was obliged to adhere.'" *Id.* at 1556 (quoting *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 413 F.2d 1167 (1969)). The Federal Circuit determined that HHS had unilaterally changed those standards. Thus, the issue for this court to decide is identical to an issue determined by the Federal Circuit.

Admittedly the final issue of the earlier Federal Circuit case was different from the final issue of this case. The ultimate issue of this case, however, was among the issues resolved by the appellate court in reaching its decision. Therefore, plaintiff satisfies the identity of issues requirement for application of collateral estoppel.

---

**13.** Defendant contends that the Federal Circuit's characterization of the facts concerning the default termination was not "based upon any discussion of the record evidence...." Def. Brief filed Jan. 18, 1989, at 13. To the contrary, this court notes that the Federal Circuit reviewed the contract, *SMS Data*, 853 F.2d at 1548, 1549, file memoranda, *id.* at 1549, 1550, the Stipulation and Agreement, *id.* at 1549, the testimony of witnesses before the Board, *id.* at 1550, 1552, correspondence between the parties, *id.* at 1550, 1551, 1552, and the Board's opinion, *id.* at 1552–54.

**14.** At another point in its opinion, the Federal Circuit stated: "The changes in the test scenario were substantial." *SMS Data*, 853 F.2d at 1549.

For another reason, defendant's argument does not persuade this court. The United States Claims Court has stated:

> Although plaintiff is *correct* that it is *not seeking* to relitigate the identical claim in the instant case that it litigated before the Board, this fact does not save plaintiff's position. While not litigating the same claim, plaintiff seeks to litigate the same underlying facts. Under established principles of issue preclusion, plaintiff is barred from doing this.

*Neal & Co., Inc. v. United States,* 13 Cl.Ct. 282, 287 (1987); *see also Golder v. United States,* 15 Cl.Ct. 513, 517 (1988); *State of Illinois v. United States,* 15 Cl.Ct. 399, 408 (1988); *Bass v. United States,* 11 Cl.Ct. 295, 298 (1986); *Jarboe–Lackey Feed Lots, Inc. v. United States,* 7 Cl.Ct. 329, 336 (1985). Defendant makes precisely the argument overruled in *Neal.* The Claims Court has already clarified that the issue preclusion doctrine is not so narrow as to require relitigation under these circumstances.

### Actually Litigated

The second step in collateral estoppel analysis examines whether the prior court "actually litigated" the precludable issue. The Federal Circuit explains that the parties to "the original action [must have] disputed the issue, and trier of fact [must have] resolved it." *Mother's Restaurant,* 723 F.2d at 1570.

Both the Board and the Federal Circuit heard and resolved the issue about the effect of the November test on plaintiff's performance requirements. According to the Federal Circuit, "a key factual premise of the Board's decision was that the underlying specifications of SMS's contract were not altered by the Stipulation and Agreement." *SMS Data,* 853 F.2d at 1554. The

appellate court, however, reached a different conclusion:

> We think the board erred in its analysis because it failed to take into account the substitution, after the award to SMS, of the more difficult November acceptance test for the July version.

*Id.* at 1555. An examination of the briefs submitted to the Federal Circuit also establishes that the parties actually litigated this issue.[15] Indeed, according to the appellate court, the Board's incorrect decision hinged on that same issue:

> At the core of the board's decision denying SMS's protest was a focus upon what the board characterized as the "unchanged specifications" of SMS's contract.

*Id.* at 1554.

After identifying GSBCA's error, the Federal Circuit explained the central issue determining its outcome:

> We now turn to explaining why we feel that when the revision of the acceptance test procedure is taken properly into account the board's decision must be reversed.

*SMS Data,* 853 F.2d at 1555. As its language indicates, the Federal Circuit is not, as defendant charges, enunciating mere *dicta.* Instead the appeals court discusses the essential base of its judgment.

In order to decide that "the reprocurement was not conducted to obtain competition to the maximum extent practicable," the Federal Circuit decided the impropriety of revising the test procedures. *Id.* at 1556. The precludable issue in this case was necessary to the Federal Circuit's earlier judgment.

### Full Representation in Prior Action

The final requirement for issue preclusion, full representation of the parties in the prior action, is not in dispute.[16] Both

---

**15.** In its brief to the Federal Circuit, defendant argued: "the court incorrectly concluded ... [that the November acceptance test] could somehow change the terms of the solicitation." Def. Petition for Rehearing, filed Aug. 18, 1988, at 12; *SMS Data Prods. Group, Inc.,* 853 F.2d 1547 (Fed.Cir.1988); *see also id.* at 13, n. 4.

Plaintiff's Federal Circuit brief argued that the "November acceptance test was created to ob-

tain the more powerful computer which Severn Bid." App. Opening Brief at 28, *SMS Data Prods. Group, Inc.,* 853 F.2d 1547 (Fed.Cir.1988). Thus, "[t]he November Acceptance Test exceeded the requirements of the July Acceptance Test, and so exceeded SMS's contract." *Id.* at 34.

**16.** This issue usually arises when a non-party in the earlier action seeks to prevent application of the doctrine of collateral estoppel in a later suit.

defendant and plaintiff were party to the prior litigation. Both enjoyed full representation within the meaning of the collateral estoppel doctrine.

Plaintiff's showings satisfy the doctrine of collateral estoppel. Plaintiff has shown that the Federal Circuit decided the critical issue about revision of the acceptance tests. Accordingly, the rule applies:

> [O]nce an issue of fact or law is actually and necessarily determined by a court of competent jurisdiction, that decision is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.

*Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *see also International Order of Jobs Daughters v. Lindburg & Co.,* 727 F.2d 1087, 1090 (Fed.Cir.1984). Thus, the Federal Circuit's determination that HHS, in effect, unilaterally changed plaintiff's contractual obligations binds this court.

Indeed, the Federal Circuit apparently criticized GSBCA for "its hesitation to confront this issue head on...." *See* note *SMS Data,* 853 F.2d at 1555. The appellate court's language suggests the impropriety of the default termination:

> The board's opinion reflects that its hesitation to confront this issue head on may have resulted from a concern that the board would be making a *de facto* determination of the propriety of SMS's termination for default, which is an issue outside the board's CICA protest jurisdiction. Such a concern was not merited.

*Id.*

In the absence of evidence of overriding faults by the plaintiff, the Federal Circuit's holding on the key issue of this case is also determinative of the impropriety of the default termination. As mentioned earlier,

defendant cannot fault plaintiff for not following standards outside the original contract. *Malone,* 849 F.2d at 1445; *Kiewit,* 138 Ct.Cl. at 674, 151 F.Supp. 726. A party which presumes to alter unilaterally a contract is in breach.

### Propriety of Default Termination

Defendant contends, however, that HHS placed plaintiff in default for overriding failures to meet contractual obligations. Defendant asserts:

> SMS was given numerous opportunities to meet these mandatory requirements, including being allowed to test different equipment than it had initially offered, *i.e.,* the dual configuration Plexus P/20, and to conduct numerous reruns of the acceptance test. GSBCA Decision ¶ 18, Def.App. 12. SMS was defaulted only after it failed to meet those contractual mandatory requirements, failed to cure the difficulties with the computer system, and offered a completely new system at the close of the cure period which it did not acknowledge would have to be tested.

Def. Brief filed Jan. 18, 1989, at 15. Defendant stressed at oral argument that HHS did not default for failure to meet the new timing requirements. Rather, defendant argues, plaintiff did not supply a computer system that followed the contract.

The plaintiff argues that HHS unilaterally changed plaintiff's performance obligations. Therefore, according to plaintiff, HHS terminated SMS's contract for failure to perform adequately an acceptance test which was not part of the contract. This court agrees with plaintiff. HHS, rather than SMS, altered the contract and imposed new obligations on the plaintiff.

In *Blonder–Tongue Laboratories, Inc. v. University of Illinois Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court examined the common-law doctrine of mutuality of parties. The Court discussed the outdated doctrine of *Triplett v. Lowell,* 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936). *Triplett* exemplified a past doctrine:

> [U]nless both parties (or their privies) in a second action [were] bound by a judgment in a previous case, neither party (nor his privy)

in the second action [could] use the prior judgment as determinative of an issue in the second action.

*Blonder–Tongue,* 402 U.S. at 320, 91 S.Ct. at 1439. The Court rejected these prior interpretations. The Supreme Court instead wrote:

> [I]t is apparent that the uncritical acceptance of the principle of mutuality of estoppel expressed in *Triplett v. Lowell* is today out of place.

*Id.* at 350, 56 S.Ct. at 1453.

**10**

■ Defendant bears the burden of proof in justifying a default termination:

> [W]e conclude that the government should bear the burden of proof with respect to the issue of whether termination for default was justified, regardless of the forum and regardless of whose 'claim' is being asserted.

*Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987); *Malone,* 849 F.2d at 1443. Under the circumstances of this case, defendant fails to meet this burden.

■ HHS placed plaintiff in default because its dual processor proposal was too complex. In the words of the Federal Circuit, "[t]he project officer's main complaint, reflected in several findings, was the complexity of SMS's dual processor solution." *SMS Data,* 853 F.2d at 1550. Defendant overlooks, however, that HHS's switch of test requirements caused plaintiff to switch on short notice to the dual processor. The Federal Circuit stated:

> The change in the test scenario was an important factor which led to a decision by SMS to perform the acceptance testing on a dual 16–bit processor configuration, in contrast to the single 16–bit processor solution SMS had initially proposed.

*Id.* at 1550. The Federal Circuit relied upon testimony from the Board's record for this proposition. *Id.* Thus, defendant contributed significantly to any problems plaintiff encountered in performing the November test.

Defendant argues that HHS did not place plaintiff in default for failure to comply with the timing portions of the changed November test. Nonetheless plaintiff's performance on the timed portions of the test influenced the default decision. The Federal Circuit unraveled the timing strand of this knot:

> The project officer also found that "[t]he type A system was unable to meet the timing requirements of Section 2.6 of the Acceptance Test Procedures."
>
> After receiving the project officer's memorandum, the contracting officer sent a cure notice.... The items listed

in the cure notice generally corresponded to the findings in the project officer's memorandum. Conspicuously, however, SMS's failure to pass the timed portion of the test was not mentioned.

*SMS Data,* 853 F.2d at 1550.

■ In any event, HHS could not properly terminate the contract for default without offering plaintiff an opportunity to perform the contract it entered. Plaintiff, due to HHS's unilateral actions, never received the opportunity to perform its September contract. HHS did not permit plaintiff to take the July acceptance test. Instead, defendant defaulted plaintiff for not complying with the changed terms of the November test. Thus, HHS denied plaintiff the opportunity to perform.

Defendant's arguments that plaintiff failed to adequately perform the November test must fail. The November test was not part of the agreement between the parties. By responding to pressure from plaintiff's competitors and imposing a changed acceptance test, defendant interfered with plaintiff's contract. Defendant may not now use this faulty November test as a basis to default plaintiff.

■ Where a contracting officer has improperly terminated a contract for default, the remedy is to convert that decision into a termination for the convenience of the Government. *Darwin Const. Co., Inc. v. United States,* 811 F.2d 593 (Fed.Cir. 1987). This case warrants application of that remedy.

## CONCLUSION

On the basis of the doctrine of collateral estoppel, plaintiff has shown that the Government unilaterally changed the performance standard contained in the contract. Defendant has not shown any fault by plaintiff, other than performance inadequacies occasioned by HHS's overriding faults. Therefore, HHS's decision to terminate plaintiff's contract for default was erroneous. The termination for default of plaintiff shall be changed to a termination for convenience of the Government.

This court grants plaintiff's motion for partial summary judgment and denies defendant's motion for summary judgment.