**SMS DATA PRODUCTS GROUP, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 361–88 C.

United States Claims Court.

March 1, 1990.

Forrest A. Hainline, III, Washington, D.C., for plaintiff.

Agnes M. Brown, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

This motion is the most recent chapter in a long history of litigation between SMS Data Products Group, Inc. (plaintiff or SMS) and the Department of Health and Human Services (HHS). In 1986, the Government awarded plaintiff a contract for computer services. HHS terminated the contract for default before perform-

ance and excluded SMS from reprocurement.

Plaintiff claimed before the Government Services Board of Contract Appeals (GSBCA) that HHS wrongfully excluded it from submitting another bid. GSBCA denied the claim, but the United States Court of Appeals for the Federal Circuit reversed on appeal. *SMS Data Prods. Group, Inc. v. United States*, 853 F.2d 1547, 1549 (Fed. Cir.1988) (*SMS I*). Before the United States Claims Court, plaintiff moved for summary judgment on an issue not resolved by the Federal Circuit—whether HHS wrongfully terminated the contract for default. This court granted plaintiff's motion. *SMS Data Prods. Group, Inc. v. United States*, 17 Cl.Ct. 1 (1989) (*SMS II*).

On July 19, 1989, plaintiff moved for summary judgment seeking lost profits and consequential damages. Defendant crossmoved for summary judgment. On February 5, 1990, after a status conference with this court, defendant filed a motion to dismiss plaintiff's lost profits claim for lack of jurisdiction.

On February 14, 1990, this court permitted oral argument on the pending motions. This court grants defendant's motion to dismiss and denies plaintiff's motion for summary judgment.

## FACTS

This court relies on the facts set forth in its previous opinion. *SMS II*, 17 Cl.Ct. at 1–6. This court also adopts the facts contained in the Federal Circuit's opinion. *SMS I*, 853 F.2d at 1547–53.

This court finds the following undisputed jurisdictional facts for purposes of resolving defendant's RUSCC 12(b)(1) motion. On April 20, 1987, plaintiff filed a claim against HHS with Janet Miller, the Contracting Officer. In pertinent part, the claim alleged that HHS unilaterally changed the acceptance test requirements of the contract at the behest of plaintiff's competitors. The claim further alleged that HHS did not conduct a competitive reprocurement after defaulting SMS. Instead, HHS purportedly succumbed to pres-

sure from plaintiff's competitors in excluding plaintiff from reprocurement.

Plaintiff asked the contracting officer for $288,652.96 to compensate for HHS's improper termination. This amount reflected bid and proposal costs, the costs of preparing for the acceptance test, the cost of performing the acceptance test, and attorney fees. The contracting officer specifically denied this claim for relief.

## DISCUSSION

Plaintiff claims lost profits and other consequential damages on two grounds. First, HHS allegedly terminated the contract at issue in bad faith. Second, SMS contends that HHS may not use the termination for convenience clause to escape consequential damages in these circumstances. Defendant rejects these contentions. Both parties move for summary judgment. Defendant also moves to dismiss for lack of jurisdiction.

### *Jurisdiction*

The United States, as sovereign, is immune from suit unless Congress specifically waives immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). In actions under the Contract Disputes Act, 41 U.S.C. § 601 et seq. (1982), Congress has placed conditions on the waiver of sovereign immunity. Plaintiff must submit a written and properly certified claim to the contracting officer. Section 605(a) of the Contract Disputes Act states:

> All claims by a contractor against the government relating to a contract shall be submitted to the contracting officer for a decision.

41 U.S.C. § 605(a).

If the contractor's claims exceed $50,-000.00, then the contractor must attest to the good faith of the underlying allegations. Section 605 explains:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c). The Contract Disputes Act waives immunity for suits in this court only after the contracting officer has rendered a decision. Section 609 states:

> Except as provided in paragraph 2 [actions against Tennessee Valley Authority], and in lieu of appealing the decision of the contracting officer ... to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court....

41 U.S.C. § 609(a)(1) (1982).

Congress required contractors to file all claims with the contracting officer to provide the Government with an opportunity to settle the case or otherwise avoid unnecessary litigation. The Senate report stated:

## I. PURPOSE

The Contract Disputes Act of 1978 provides a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims. *The act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation;* equalize the bargaining power of the parties when a dispute exists; provide alternate forums suitable to handle the different types of disputes; *and insure fair and equitable treatment to contractors and Government agencies.*

S.Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), U.S.Code Cong. & Admin.News 1978, p. 5235 (emphasis added). The certification provisions also discourage frivolous and fraudulent claims. *Contract Disputes Act of 1978: Joint Hearings on S.2292, S.2787 & S.3178 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate*

*Comm. on the Judiciary*, 95th Cong.2d Sess. 21 (1978).[1]

The Disputes Act's limitations on the waiver of sovereign immunity necessarily restrict the jurisdiction of this court. The Court of Claims explained:

> The Government correctly notes that in order to invoke the jurisdiction of this court under the direct access section of the Contract Disputes Act—§ 609(a)(1)—there must first be a "decision" (or failure to decide) by the contracting officer.... Absent this "claim," no "decision" is possible—and, hence, no basis for jurisdiction in this court.

*Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 183–84, 645 F.2d 966, 971 (1981). Since *Paragon*, the Federal Circuit has repeatedly held that these requirements are prerequisites to Claims Court jurisdiction. *Ball, Ball & Brosamer v. United States*, 878 F.2d 1426 (Fed.Cir. 1989); *Thoen v. United States*, 765 F.2d 1110 (Fed.Cir.1985).

Plaintiff did not file a claim for lost profits with the contracting officer. In its claim, plaintiff only asked for the following compensatory relief:

### III. RELIEF REQUESTED

Based on the above claim, SMS requests the following relief:

1. HHS should rescind the termination for default, or in the alternative, convert the termination for default into a termination for convenience.

2. HHS should pay to SMS a total of $288,652.96 (see attached Schedules 1 through 4 and Summary) for:

    a. Bid and proposal costs of $48,435.37;

    b. The costs of preparing for the acceptance test of $114,680.67;

    c. The costs of performing the acceptance test of $10,066.93;

    d. Attorneys fees and related costs of $105,469.99.

Defendant's Motion to Dismiss, filed Feb. 5, 1990, Appendix (Def. App.), at 37–38.

Plaintiff's § 605(c) certification of good faith and accuracy similarly attests only to these types of compensatory relief. Mr. Joseph Grajewski, SMS's Vice President, certified that "[t]he amount requested accurately reflects the cost of the termination for convenience for which SMS Data Products Group, Inc. believes the Government is liable." *Id.* at 39.

Because plaintiff did not claim lost profits, the contracting officer's decision naturally denied only the request for compensatory relief. Absent a claim for lost profits before the contracting officer and a subsequent decision, this court lacks jurisdiction to grant plaintiff's motion.

Plaintiff contends, however, that the request for lost profits is not a separate claim which it first must file with the contracting officer. Rather, according to plaintiff, lost profits merely constitute an additional quantum of damages that arises from the same set of operative facts as plaintiff's compensatory claim.

■ The Disputes Act does not bar plaintiff from seeking an amount of damages that exceeds the quantum in the claim to the contracting officer. The excess quantum must, however, spring from the same certified claim. Plaintiff may not seek damages for a new claim—a claim not yet submitted to and decided by the contracting officer. *Tecom, Inc. v. United States*, 732 F.2d 935 (Fed.Cir.1984); *Glenn v. United States*, 858 F.2d 1577 (Fed.Cir. 1988); *LDG Timber Enters., Inc. v. United States*, 8 Cl.Ct. 445 (1985).

In *Tecom*, plaintiff submitted a claim for $11,000.00. After the contracting officer denied the claim, plaintiff asked the Armed Services Board of Contract Appeals for $72,752.10. The Federal Circuit allowed this higher claim for relief. The increase, however, did not reflect a change in the basis for recovery. Rather, plaintiff asked for additional reimbursement reflecting "an improved reevaluation of the original

---

1. The Congressional committee reports on the Disputes Act do not discuss the certification provisions. Admiral Rickover recommended the requirement during the hearings and the Senate adopted it as an amendment on the floor. 124 Cong. Rec. 36267 (daily ed. Oct. 12, 1978).

estimate" as well as "a projection of that increased sum for the expected full three-year term of the contract." *Tecom*, 732 F.2d at 937.

In *Glenn*, plaintiff sought $31,500.00 because the Government wrongfully withheld payment. The contracting officer, however, required plaintiff to pay reprocurement costs and liquidated damages. At the Claims Court, plaintiff sought $66,570.32. This additional quantum of damages was not a new cause of action. Rather, the increased amount resulted "from the denial of his initial claim in the C.O.'s liability decision and additional setoffs determined in the [C.O.'s] quantum decision." *Glenn*, 858 F.2d at 1580. Consequently, the Federal Circuit upheld plaintiff's right to seek the higher amount.

In *LDG Timber*, the Claims Court refused to allow plaintiff to change the basis for recovery:

> [The claim before the Claims Court] is not merely an aspect of a claim which has already been presented to the CO and on which the CO has deliberated. Rather, it raises new matters which must, in the first instance, be presented to the CO for his consideration (including the possibilities of settlement). Since plaintiff failed to present this claim to the CO, this court is without jurisdiction to hear the matter.

*LDG Timber*, 8 Cl.Ct. at 455.

█ The case at bar most resembles *LDG Timber*. Plaintiff's lost profits claim before this court is fundamentally different from the claim presented to the contracting officer. Plaintiff's request for compensatory relief and the present claim for lost profits necessarily involve different theories of liability. Plaintiff's compensatory damages claim involved proof of circumstances beyond HHS's control which rendered the contract obsolete or impracticable. Plaintiff's lost profits claim, however, involves proof that HHS willfully obstructed performance. By seeking lost profits,

plaintiff asserts that HHS intentionally or maliciously breached its agreement. Plaintiff's lost profits claim is different from its compensatory relief claim.[2] Plaintiff has not presented its new lost profits claim to the contracting officer. This court therefore may not exercise jurisdiction over plaintiff's request for lost profits.

This result upholds the policy of the Contract Disputes Act. The Act provides the Government notice of claims and an opportunity to settle or otherwise dispose of disputes without litigation. In the case at bar, plaintiff's claim for costs provided the contracting officer with no notice of a potential breach damages action.

█ Plaintiff further contends that it did not know and could not have known of HHS's bad faith when it filed a claim with the contracting officer. Consequently, plaintiff asks this court to allow an increase in the amount of its claim that reflects lost profits and consequential damages.

The Contract Disputes Act states: *"All* claims ... shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (emphasis added). The Act does not permit claims discovered after an initial decision to escape contracting officer review. The Act exempts no claims from contracting officer review. Upon discovery of a new claim, a contractor must submit it to the contracting officer.

Even if the court accepted plaintiff's legal premise, however, the facts do not show that plaintiff was unaware of the basis for its breach damages claim. At the time of its first claim to the contracting officer, plaintiff knew all the facts now alleged to show bad faith. Def. App., at 35–36. Plaintiff also knew the facts now cited as evidence of HHS's callous insensitivity to SMS and favoritism to SMS's competitors. Plaintiff further implied in its claim to the contracting officer that the termination exuded a suspicious or "piscatorial" odor. Def. App., at 37.

---

**2.** Prior to the Contract Disputes Act, the Court of Claims considered an action for breach damages as a separate claim from an action for costs under the contract. *National Factors, Inc.*

*v. United States,* 204 Ct.Cl. 98, 492 F.2d 1383 (1974); *Quality Env't Sys. v. United States,* 7 Cl.Ct. 428, 432 n. 2 (1985).

In sum, plaintiff has not yet presented its lost profits claim to the contracting officer. Moreover, plaintiff knew, at the time it filed its claim with the contracting officer, the facts it now asserts to show HHS's alleged bad faith. This court therefore lacks jurisdiction over plaintiff's lost profits claim and must deny its motion for partial summary judgment.

### Summary Judgment

Even if plaintiff successfully demonstrated that this court has jurisdiction over its lost profits claim, it would not prevail. Plaintiff has not adequately supported its motion for partial summary judgment. Furthermore, defendant has shown that HHS's good faith is not materially at issue.

When no material facts are in dispute, RUSCC 56 authorizes this court to resolve issues as a matter of law. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983). A movant for summary judgment bears the burden of showing the absence of any genuine issue of material fact. *Id.* at 1146. The movant also can discharge its burden by demonstrating that the nonmoving party failed to establish some element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ When evaluating the merits of a summary judgment motion, this court must resolve reasonable factual disputes in favor of the non-movant. *Auld*, 714 F.2d at 1146. Mere denials, speculation, or bald assertions do not create an evidentiary conflict sufficient to defeat a summary judgment motion. *Barmag Barmer Maschinenfabrik AG v. Murata Machine, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984).

### Bad Faith

The parties agree that plaintiff may recover lost profits if it can show that HHS terminated the contract in bad faith. This court's predecessor, the United States Court of Claims, traditionally equated bad faith with actions motivated by malice or the specific intent to injure. *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1302, *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Knotts v. United States*, 128 Ct.Cl. 489, 492–93, 121 F.Supp. 630, 630–31 (1954).

This court presumes that Government officials act in good faith. *Kalvar*, 543 F.2d at 1301; *Knotts*, 121 F.Supp. at 631. Consequently, plaintiff only can show bad faith by "well nigh irrefragable proof." *Kalvar*, 543 F.2d at 1301–02; *Knotts*, 121 F.Supp. at 631. Plaintiff failed to satisfy this quantum of proof.

### HHS Conspiracy with SMS Competitors

■ Plaintiff contends HHS conspired with disappointed bidders (Severn, C3, Inc.) to change SMS's contract. HHS purportedly demanded more powerful computer equipment than it sought during award of the contract. In support of this contention, plaintiff reminds the court that HHS entered into a stipulation with plaintiff's competitors without plaintiff's participation and consent. Plaintiff further contends that the disgruntled bidders suggested enhancement of the July acceptance test. HHS apparently knew that this new test would change the contract and that plaintiff would be less likely to meet the tougher performance standards.[3]

These undisputed facts, however, do not show bad faith. To the contrary, HHS acted in good faith attempting to ensure that SMS could meet the original terms of the contract.

---

**3.** Doctor Wolford, HHS Contracting Manager, testified at the GSBCA proceedings:

> Q [Plaintiff's Counsel]: Did you at any time come to the conclusion that the additions to the July acceptance test found in the November acceptance test made it less probable that SMS would pass the acceptance test?
>
> A [Dr. Wolford, HHS Contracting Manager]: Yes.
>
> Q: And did you come to that conclusion as early as the time you recommended to the Contracting Officer that she sign the stipulation and agreement?
>
> A: I came to that conclusion on Sunday night before the Monday hearing, when I stated to Mr. Steere that "what goes around comes around," and I said, "You're going to be prepared in the event that SMS fails its acceptance test to run it."

Transcript of Proceedings, GSBCA No. 8912–P, May 4, 1987, at 213.

The stipulation and enhanced acceptance test were not the product of conspiracy, but of compromise in the wake of ongoing bid protests against HHS. After HHS awarded the contract to plaintiff, C3, Inc. protested the contract award before the GSBCA. Severn and Computer Marketing Corporation joined the action as intervenors. These unsuccessful bidders named HHS as respondent. The bidders questioned SMS's ability to meet the mandatory requirements of the contract. They contended that HHS should not have considered SMS for the job and consequently should not have awarded the contract to SMS.

Faced with the time-consuming and expensive prospect of litigation, not to mention the possibility of a defective award and subsequent reprocurement, HHS initiated settlement negotiations with the disgruntled bidders. On November 14, 1986, HHS entered into the stipulation with the bid protestors. The Federal Circuit described the terms of the stipulation:

> The gist of the Stipulation and Agreement was that the government was obligated to create an enhanced acceptance test to administer to SMS, which was to include at a minimum certain items stated in an attachment to the document. If SMS failed the enhanced acceptance test, it was to be placed in default and the contract awarded to the next highest ranked offeror without any further negotiations, discussions, or opportunity for best and final offers.

*SMS I*, 853 F.2d at 1549.

The stipulation addressed the major contention of the bid protestors. The protestors believed that SMS's proposal did not meet HHS's original performance expectations. The stipulation therefore endeavored to impose a test that would measure SMS's equipment against the mandatory requirements of the solicitation.

Thus, HHS did not participate in a conspiracy to injure or defraud SMS. HHS took action to ensure that SMS would satisfy the terms of the contract. HHS's action, unilaterally altering a test which was part of the contract, was improper. The Federal Circuit has already made, and this court has acknowledged, that finding. *SMS II*, 17 Cl.Ct. at 1–6. HHS did not, however, act in bad faith. With reason to believe its original acceptance test would not determine SMS's ability to meet contractual requirements, HHS took improper, but well-motivated action. HHS's intent was not malicious, but constructive. HHS hoped to ensure compliance with contractual obligations and prevent vexatious future disputes.

Moreover, HHS's efforts to dispose of the bid protests could have benefitted plaintiff. Resolution of the protest had the potential to ensure that SMS could work without interference and the threat of reprocurement. In sum, HHS exhibited no malice toward SMS. The mere fact that HHS pursued, and achieved, settlement of the protest, does not show bad faith by "well nigh irrefragable" proof.

Furthermore, the terms of the stipulation reflected sound business purpose. The stipulation awarded the contract to the next highest bidder instead of requiring competitive reprocurement. HHS agreed to this term not to benefit Severn, but to meet its own immediate needs:

> Q And why did you think it practicable not to have a new competition, but just to go back to the original?
> A A new competition would have taken anywhere between about 120 to 150 days and maybe longer. So you're talking about six months before you could have had another contract in place if I had gone out again.

Transcript of Proceedings, GSBCA No. 8912–P, filed May 12, 1987 (Tr.), at 143–44. HHS's contracting officer also stated that the Department had an "urgent need" to complete the contract. *Id.* Thus, HHS's goal was to avoid the time and expense of a legal confrontation and subsequent reprocurement, not to harm plaintiff for the benefit of other computer services competitors.

HHS imposed the enhanced acceptance test improperly, but not maliciously. HHS imposed the test for sound business reasons, not with a specific intent to injure.

After speaking with the bid protestors, HHS believed that its original acceptance test would not measure SMS's ability to satisfy the mandatory requirements of the contract. Thus, HHS did not change the acceptance test to displace plaintiff. Rather, HHS sought to ensure that its procurement met the original specifications. *See, e.g.,* Tr. at 246–47 (testimony of Dr. Wolford).

HHS also displayed good faith under the enhanced standard by giving plaintiff considerable leeway prior to termination. During testing under the improper enhanced standards, HHS permitted plaintiff to use equipment more powerful than contemplated under the original bid proposal. HHS permitted these changes despite specific prohibition in the stipulation of any alterations in SMS's original proposal. *See, e.g.,* GSBCA Opinion, at 12. This flexibility evinced an intent to cooperate rather than to injure.

HHS also departed from the stipulation and agreement to give plaintiff additional opportunities to satisfy performance requirements. The stipulation provided that plaintiff would perform only one rerun of the acceptance test. HHS, however, allowed numerous timing reruns of the dual configuration. HHS sought to complete the contract with SMS, even under the tougher November acceptance standards, rather than summarily displace plaintiff.

Plaintiff contends that HHS exercised bad faith because it imposed a tougher acceptance test with knowledge that SMS might fail. While this court acknowledged that HHS wrongfully changed the contract, this determination is not synonymous with an intent to injure plaintiff. The record demonstrates that up until the actual date of termination, HHS made every effort to preserve the existing contractual relationship. On February 5, 1987, instead of terminating plaintiff, HHS sent plaintiff a cure notice. The cure notice gave plaintiff an additional 10 days to supply equipment that met the six mandatory requirements of the contract. On February 10, 1987, HHS met with plaintiff to discuss proposed

methods of curing defects. HHS worked out a testing schedule for February 16.

While HHS initially refused to accept other equipment, it ultimately acquiesced in accepting documentation for such substitutions. Plaintiff, however, never expressly offered the other equipment as a cure. Only after plaintiff failed to complete testing and proposed to deliver substitute equipment 45 days later without testing did HHS terminate the contract. In sum then, plaintiff has not shown bad faith by well nigh irrefragable proof.

*Unjustified Use of Termination for Convenience Clause*

■ Plaintiff also contends that it may recover lost profits and other consequential damages because defendant cannot properly justify its action as a termination for convenience. Citing *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982), plaintiff argues that the Government only may terminate for convenience where conditions or the parties' expectations have changed. Plaintiff contends that HHS did not terminate for these reasons. Rather, HHS purportedly changed the contract to obtain more sophisticated computers that it had rejected before contracting with plaintiff. Plaintiff concludes that an award of lost profits under such circumstances is consistent with the Court of Claims' ruling in *Torncello.* Defendant counters that HHS sought only compliance with contract specifications, not a changed bargain.

Plaintiff's reading of *Torncello* unnecessarily limits the availability of the termination for convenience clause. Traditionally, the Government could invoke the clause so long as it did not act in bad faith or clearly abuse its discretion. The Court of Claims explained:

> In the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause.

*Kalvar Corp.,* 543 F.2d at 1304; *see also, John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 390, 325 F.2d 438, 442 (1963),

*cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

*Torncello* did not change the traditional understanding of when the Government could terminate for convenience. In *Torncello,* the Government had contemplated a contract award on an "all or none basis." *Torncello,* 681 F.2d at 758. Yet, after awarding the contract, the Government sought services from a competitor of the contractor. The Government apparently wanted "to take advantage of a price that the Government had known about at the award date" even though "the contractor ... remained at all times ready and willing to perform as per its agreement." *Torncello,* 681 F.2d at 760. A majority of the court only held that the Government's particular conduct, which amounted to a classic case of bad faith, did not constitute a valid termination for convenience. *Torncello,* 681 F.2d at 772, 773–74.[4]

As previously discussed, plaintiff has not shown by "well nigh irrefragable proof" that HHS terminated the contract in bad faith. Consequently, this court properly characterized HHS's action as a termination for convenience in its last opinion. *SMS II,* 17 Cl.Ct. at 10; *see also, Darwin Constr. Co. v. United States,* 811 F.2d 593 (Fed.Cir.1987).

In dictum, a majority of the *Torncello* court agreed that the Government could not construe the termination for convenience clause so as to render the contract illusory. *Torncello,* 681 F.2d at 760 (plurality opinion), 773 (Davis, J., concurring). A plurality cited changed conditions or expectations as circumstances where the Government could terminate for convenience without rendering the contract illusory. The court, however, did not purport to offer an exhaustive list of circumstances where the Government could invoke the clause and still maintain the non-illusory nature of a contract.

The Federal Circuit later applied the *Torncello* dictum in *Maxima Corp. v. United States,* 847 F.2d 1549 (Fed.Cir. 1988). In *Maxima,* plaintiff and the Government entered into a requirements contract for photocopying services. One year after completion of the contract, however, the Government advised plaintiff that the contract allegedly had terminated for convenience because the Government did not order the minimum amount of services from plaintiff. The Federal Circuit rejected the Government's convenience termination because it rendered the contract illusory. The Government's minimum payment for a minimum amount of services were the basis of the bargain and therefore constituted consideration. Further, no extenuating circumstances justified termination for convenience:

> The government argues that the Agency's failure to order the minimum quantities from Maxima is proof of changed expectations. However, this governmental action taken a year after completion of performance of the contract by both parties is not a cancellation based on changed expectations. It is, at best, a claim for retroactive adjustment in the contract price.

*Maxima,* 847 F.2d at 1555. The Federal Circuit further remarked:

> The government argues that a ruling in favor of Maxima would render the termination for convenience clause superfluous, and thus would violate regulations which require inclusion of the clause in the contract. However, the issue is not whether the government could have invoked the termination for convenience clause during the term of the contract, for it did not do so. *The purpose of the clause is not to authorize unilateral renegotiation of a contract after it has been fully performed.*

---

**4.** Each of the opinions in *Torncello* focused on the bad faith acts of the Government. Judge Bennett, writing the plurality opinion, stated: "We hold in this opinion only that the government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations." *Torncello v. United States,* 231 Ct.Cl. 20, 47, 681 F.2d 756, 772

(1982). Similarly, Judge Davis remarked in his concurring opinion: "Here, too, I would be ready to hold that a contracting officer acted in bad faith when he terminated a contract for convenience to get a better price of which he had full knowledge ... at the time when he deliberately entered into the contract with plaintiff." *Id.* at 773–74.

*Maxima,* 847 F.2d at 1555 (emphasis added) (footnote omitted).

HHS's termination for convenience does not render SMS's contract illusory. Unlike *Maxima,* HHS could terminate for convenience because the "circumstances of the bargain" changed. *Torncello,* 681 F.2d at 766. During performance, HHS discovered that the original acceptance test would not adequately gauge whether plaintiff's equipment satisfied the mandatory requirements of the contract. *See, e.g.,* Tr., at 193–94, 254 (testimony of Dr. Wolford).

HHS modified the acceptance test immediately upon discovery of its defects to ensure that plaintiff's system would satisfy all the Government's performance needs. *See, e.g.,* Tr. at 235–36 (testimony of Dr. Wolford). After it changed the acceptance test and recognized that plaintiff's 16–bit system could not meet performance expectations, HHS began to consider the prospect of default. This consideration stemmed not from pressure by other contractors, or to gain something beyond the contract, but from a genuine concern that SMS could not deliver equipment that would meet the contract's mandatory requirements. *See, e.g.,* Tr. at 233–35 (testimony of Dr. Wolford).

If HHS did not terminate the contract, it feared acquisition at great expense of a system that did not satisfy the contract or its needs. HHS did not change the acceptance test and subsequently terminate the contract in bad faith. Thus, denying lost profits and consequential damages in this case is consistent with the Court of Claims' interpretation of the scope of the termination for convenience clause.

## CONCLUSION

This court lacks jurisdiction over plaintiff's lost profits claim. Plaintiff did not properly file a certified claim for lost profits. The contracting officer therefore could not render a decision on lost profits, which is necessary to establish this court's jurisdiction.

Even if plaintiff prevailed on the issue of jurisdiction, it still would not receive lost profits. Plaintiff did not prove bad faith by well nigh irrefragable proof. In fact, the undisputed facts of this case show that HHS acted improperly, but not in bad faith.

Furthermore, the termination clause appropriately applies to this case. Invoking the termination for convenience clause would not render the contract illusory. Therefore, this court denies plaintiff's motion for summary judgment and grants defendant's motion to dismiss.