**HUNA TOTEM CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–878C.

United States Court of Federal Claims.

May 24, 1996.

Daniel G. Bruce, Juneau, AK, for plaintiff.

Steven J. Abelson, Washington, D.C., of the U.S. Department of Justice with whom was James J. Ustasiewski of the U.S. Department of Agriculture, for defendant.

## OPINION

ROBINSON, Judge:

Plaintiff brought this action for breach of contract. The matter is now before the court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment. Oral arguments were held on May 7, 1996. The contract at issue covers a timber transportation cost share agreement between Huna Totem Corporation ("Huna Totem") and the United States Forest Service ("Forest Service"). The parties disagree on the underlying interpretation of the contract terms from which the breach allegedly arises. The court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment.

## BACKGROUND

This dispute concerns the transportation of timber resources located in and adjacent to the Tongass National Forest on Chicagof Island. This island lies offshore the Southeastern coastline of Alaska and is surrounded by the Icy Strait to the north, the Peril Strait to the south, the Gulf of Alaska to the west, and Chatham Strait to the east. The land on the northeastern portion of Chicagof Island is a vast, undeveloped wilderness with substantial timber resources. In early 1980, Huna Totem, a native Alaskan corporation, planned on developing and harvesting its timber resources located on this land as a means of providing employment and paying dividends to its shareholders. At the same time, the Forest Service was preparing an environmental impact statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, 4331–35, 4341–47 (1969), for a five-year road construction and logging operations plan of the Alaska Pulp Corporation ("APC"). With various timber companies forming plans to harvest the timber resources on their respective lands, Huna Totem entered discussions with the Forest Service for the development of roads designed to provide a means of transporting timber that would accommodate its needs.

On June 10, 1982, the Forest Service and Huna Totem signed a ten-page Road Right-of-Way Construction and Use Agreement ("master agreement"). Under this agreement, the parties agreed to share the costs of developing roads providing access to and from areas of timber development on the parties' parcels of land, referred to as "tributary areas." The terms of the master agreement, one of which provided for the addition of supplemental agreements as the construction of specific roads and facilities was contemplated, are not in dispute.

On September 10, 1982, the Forest Service and Huna Totem entered into Supplements 1 and 2 to the master agreement. While the master agreement set forth the basic procedures for the construction and maintenance of the roads, the supplements provided for the construction of specific roads and identified those roads that were to be jointly financed by the parties to the agreement. In particular, Section 3 of the supplements identifies the roads constructed or planned to be constructed and lists the corresponding costs. More importantly, Sections 4 and 5 of the supplements set forth the basis for calculating and paying each party's cost share as follows:

> 4. *Basis of Cost Sharing.* The parties agree that the share of the construction to be borne by each party is set forth as stated in Section 3 above.... The parties agree that if within three (3) years of the signing of Supplement No. 1 [and 2] it is determined that the tributary area used as the basis of cost sharing changes by more than twenty-five percent (25%), the shares and excess costs will be recalculated....
>
> 5. *Method of Payment.* Unless amortized by other credits, it is intended that ... excess costs incurred under this supplement will be recovered ... at a rate of $1.01 per MBF [thousand board feet] or equivalent unit measure for its products hauled over the road, or at such higher rate as may be approved....

*Def.'s Mot. for Summary Judgment* at App. 567, 586. Thus, Supplements 1 and 2 provided a three-year window ending on September 10, 1985, for cost share recalculation. The parties agree that the language of Sections 4 and 5 was specially crafted for this cost share agreement.

On September 15, 1989, Huna Totem sent a certified claim to the contracting officer alleging that the Forest Service had determined to haul timber from the Whitestone tributary area over the cost share roads to the Long Island Harbor log transfer facility ("LTF"), entitling Huna Totem to a recalculation of its cost share. Plaintiff claimed it was entitled to reimbursement for overpaying its cost share by $846,356. On March 5, 1990, the contracting officer issued a final decision denying Huna Totem's claim. On February 4, 1991, Huna Totem filed a complaint with this court alleging that the Forest Service was liable for breach of contract by failing to recalculate the parties' cost shares. Plaintiff also alleges that the government breached its implied duty of good faith and fair dealing by failing to construct the Whitestone Harbor LTF.

## CONTENTIONS OF THE PARTIES

Based on discussions with the Forest Service, plaintiff alleges that the Forest Service was contemplating, if not planning, the construction of an LTF at Whitestone Harbor that would lie in the heart of the Whitestone tributary area. Construction of this facility, as well as the network of roads constructed pursuant to the cost share agreement, would give the parties access to their respective timber resources. This Whitestone Harbor LTF, plaintiff suggests, would have ensured that the parties' costs would not exceed those contemplated by the cost share agreement embodied in the master agreement and Supplements 1 and 2. In the event that the Whitestone Harbor LTF was not constructed, over 500 million board feet ("MMBF") contained within the Whitestone tributary could conceivably be transported over cost share roads to the Long Island LTF. That is, substantial amounts of timber from an area outside the original cost share tributary areas could become tributary to the Long Island LTF. The Forest Service ultimately decided not to build the LTF at Whitestone Harbor. Plaintiff alleges that the Forest Service, without the knowledge of Huna Totem, thus added the Whitestone tributary

area to the cost share agreement. Plaintiff argues that under Section 4 of the supplements to the master agreement, such action by the Forest Service should have triggered a recalculation of the parties' respective cost shares.

Plaintiff contends that as of September 1, 1985, the Forest Service knew: that the proposed Whitestone Harbor LTF was not economically feasible; that the Forest Service had internally diverted funds away from the Whitestone Harbor LTF project to less expensive, impermissible road construction that would network the entire Whitestone tributary area with the cost share system; that the Forest Service's contractual obligations with APC required the harvesting of 200–250 MMBF from the Whitestone tributary area for the 1981–1990 operations although the cost share agreement contained in the two supplements to the master agreement permitted the removal of only 10 MMBF; and that the Forest Service actually knew that the government would have to pay Huna Totem at least $713,000 in cost share adjustments if the entire Whitestone tributary area was thus accessed. Thus, plaintiff contends that the Forest Service breached its contract with Huna Totem and, in so doing, violated its duty of good faith and fair dealing. Plaintiff also argues that defendant's interpretation of the cost share agreement gives rise to a latent ambiguity, which must be construed against the Forest Service through application of the doctrine of contra proferentem.

Defendant contends that Huna Totem's entire theory of recovery is predicated on a misguided and unreasonable interpretation of the cost share agreement. According to the government, Huna Totem has misconstrued the agreement to require that the entire Whitestone tributary be included within the cost share agreement once the Forest Service has decided to haul any amount of timber from the Whitestone tributary area over cost share roads, no matter how minimal the amount. Huna Totem's understanding of Section 4 of Supplements 1 and 2, defendant contends, would cause the tributary area used as the basis for cost share recalculation to envelop all the timber within the Whitestone tributary area. Defendant claims that,

no matter what Huna Totem's subjective expectancies were, this is a clearly incorrect construction of the cost share agreement's recalculation clause. This is even more apparent, says defendant, since the Forest Service never made any determination to change the tributary area covered by the agreement by more than 25%. The government's response indicates that the road right-of-way construction and use cost share agreement did not incorporate either party's expectancies with regard to the construction of the Whitestone Harbor LTF. Further, defendant contends that plaintiff's accusations that the government violated its duty of good faith and fair dealing ring hollow as this allegation is grounded in neither fact nor law. Finally, defendant argues that plaintiff's interpretation of the cost share agreement is patently ambiguous and invokes plaintiff's duty of inquiry, which Huna Totem has failed to satisfy.

### DISCUSSION

Summary judgment pursuant to Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC") is the appropriate means for disposing of a case or issue in which the movant or cross-movant is entitled to judgment as a matter of law and there are no genuine issues of material fact in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When considering cross motions for summary judgment, "the court must consider each motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constr. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). The standard for whether there is no material issue of disputed fact is whether "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). In determining entitlement to summary judgment, the court may look beyond the plead-

ings to determine in which party's favor the questions of law will be resolved and whether any apparently material issues of fact are merely illusory.

## I. *Contract Interpretation*

 Breach of contract is the central issue to the parties' respective motions for summary judgment, in which they agree that there are no material issues of disputed fact. In order to reach the issues of breach and remedies, it is necessary as a threshold matter to ascertain the exact meaning of the contract terms, which define the parties' rights, responsibilities, and liabilities. Thus, contract interpretation necessarily precedes breach analysis. As stated by the Federal Circuit recently, the "principal objective in deciding what contractual language means is to discern the parties' intent *at the time the contract was signed.*" *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir. 1995) (emphasis added), *cert. granted,* —— U.S. ——, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996). Cases presenting issues of contract interpretation, a question of law, are particularly suited to resolution by summary judgment. *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir. 1984). Initially, as a matter of contract interpretation, the court must look at the plain meaning of the terms of a contract to determine whether the parties' objectively manifested intent can be gleaned therefrom. If the intent of the parties can be discerned from the contract language as a whole and the parties' purpose for entering into the contract, this interpretation controls. Contract interpretation constitutes an objective test, and the standard is what a similarly situated, reasonably prudent contractor would have understood the contract language to mean, not what the drafter or any other party subjectively intended the contract to mean. *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988); *Badgley v. United States,* 31 Fed.Cl. 508, 511 (1994).

### A. Plain Meaning

 With regard to the calculation of cost shares, the intent of the parties in the present case may be ascertained from the language of the cost share agreement, including Sections 4 and 5 of Supplements 1 and 2, which endorse a plain meaning interpretation. It is a well-settled rule of law that contracts must be interpreted as a whole rather than by splintering the language. *See Fortec Constr. v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983); RESTATEMENT (SECOND) OF CONTRACTS §§ 201, 202 (1981). Sections 1 and 2 of the master agreement provide for the incorporation of the supplements, which were to precisely identify, schedule, and define the road construction projects and corresponding costs. Section 4 of the supplements sets forth what must occur in order to trigger a recalculation. Nothing else in the contract alters these conditions. The only way costs were to be recalculated was if a determination was made between September 10, 1982, and September 10, 1985, to change the tributary area used as the basis for cost calculation and allocation by at least 25%. To "change" the tributary area used as the basis for costs, the amount of timber hauled over cost share roads must change. In other words, the contract indicates that volume was to be the gauge for measurement of the parties' responsibilities. Thus, change would occur only as a function of timber volume, not the size of the geographic area from where the timber was to be extracted. Perhaps most importantly, recalculation requires an actual determination to haul timber from one of the other tributary areas on Chicagof Island, such as Whitestone, over cost share roads. Nowhere in the contract is there an expression of the parties' intent to change the area of timber hauling activity over cost share roads from the Whitestone tributary area. There is neither any suggestion in the contract that the Forest Service intended to build an LTF at the Whitestone Harbor site, nor that Huna Totem premised formation of the cost share agreement on construction of such a facility. Section 5 clarifies the basis of cost sharing in Section 4 by indicating that the basis varied with the *amount or volume* of timber hauled over cost share roads, not the geographical surface area that could conceivably be encompassed by the parties' hauling activities. There is no support in the

contract for either aspect of plaintiff's theory, i.e., that the Forest Service's failure to build the Whitestone Harbor LTF or that any hauling of timber, no matter how minuscule, from the Whitestone tributary area over cost share roads, precipitated the inclusion of the entire Whitestone tributary area and all the timber located therein in the basis of cost share calculation.

■ Contract terms should be interpreted without "regard either to the probable intention of the parties contracting, or to the probable changes which they would [have] made in their contract, had they foreseen certain contingencies." WILLIAM W. STORY, A TREATISE ON THE LAW OF CONTRACTS § 639, at 562 (2d ed. 1847). If plaintiff understood that the agreement contained, by implication, the condition that the Whitestone Harbor LTF would be built, it should have insisted that the agreement unequivocally state this. That is precisely what a reasonably prudent contractor would have done before entering into the agreement. This court invokes the maxim of legal interpretation, *expressio unius est exclusio alterius*—the expression of one term is the exclusion of another. "Where certain things are specified in detail in a contract, other [terms] of the same general character relating to the same matter are generally held to be excluded by implication." *Nicholson v. United States,* 29 Fed.Cl. 180, 196 (1993) (citing GROVER C. GRISMORE, PRINCIPLES OF THE LAW OF CONTRACTS § 105, at 164 (1947)); *United Pac. Ins. Co. v. United States,* 204 Ct.Cl. 686, 692, 497 F.2d 1402, 1405 (1974). Even if the Forest Service at some earlier time intended to construct an LTF at Whitestone Harbor, since that intent is not reflected in the agreement, this court will not contradict the plain meaning of the parties' objectively manifested intent by inserting subjective, unwarranted expectations into the cost share agreement.

It is a "well accepted and basic principle [of contract interpretation]" that, wherever possible, contracts must be interpreted to give reasonable meaning to all provisions of the contract; such an interpretation, the court iterates, is always preferable to one which collapses parts of the contract into meaninglessness, superfluousness, or redundancy. *Fortec Constr. v. United States,* 760 F.2d at 1292; *Reliable Bldg. Maint. Co. v. United States,* 31 Fed.Cl. 641, 643 (1994); *Sharpe Refrigeration, Inc. v. United States,* 30 Fed.Cl. 735, 738 (1994). Plaintiff has failed to contest evidence submitted by the Forest Service that the entire amount of timber hauled from the Whitestone tributary area over cost share roads through May 18, 1989, totalled approximately 63 MMBF.[1] The total amount of timber hauled from the relevant Long Island tributary area used as a basis for cost calculation was approximately 340 MMBF. The total amount of timber hauled from the Whitestone tributary area over cost share roads through May 18, 1989, constituted a change of less than 18.6% of the amount necessary to trigger a recalculation. Moreover, no timber originating from the Whitestone tributary area was hauled over cost share roads during the relevant three year window. Instead of challenging these figures, plaintiff submits to the court that the government's mere failure to build the Whitestone Harbor LTF without any hauling whatsoever over cost share roads of timber from the Whitestone tributary area precipitates the inclusion of the entire Whitestone tributary area and all the timber located therein. Thus, plaintiff contends that a recalculation is in order. This interpretation, however, would render the carefully crafted language of Sections 4 and 5 unnecessary, ineffective, and confusing. That is precisely the result courts strive to avoid, and in this case, there is no need or justification for endorsing plaintiff's misinterpretation.

### B. Extrinsic Evidence

■ Plaintiff urges this court to consider extrinsic evidence in combination with principles of fairness and equity in interpret-

---

1. While the government stated in its brief that a total of 40 MMBF of Whitestone timber had been hauled over cost share roads through May 18, 1989, *Def.'s Mot. for Summary Judgment* at 10, defendant's counsel stated that he had been in-formed by the government's Forest Service of counsel on the day of oral arguments that this figure might have been as high as 63 MMBF. *See Transcript, May 7, 1996.*

ing the recalculation clause of the cost share agreement. "The extrinsic facts necessary to interpret the contract are unambiguous upon the dispositive issue in the case, therefore, the court may interpret the contract as a matter of law and grant summary judgment." *Pl.'s Opp'n to & Cross–Mot. for Summary Judgment* at 20. Contract interpretation may be aided by examining circumstances surrounding formation, even though they may not have been reduced to writing and included within the four corners of the instrument itself. In this case, there is no dispute that the instrument consists of the master agreement and accompanying supplements.[2] However, the parol evidence rule, a rule of substantive law rather than evidence, bars the introduction of extrinsic evidence antecedent to or contemporaneous with contract formation for the purpose of adding to, subtracting from, varying, or contradicting the terms of a written contract, which is final, complete, unambiguous, and unaffected by mistake, fraud, or accident. *California Sand & Gravel, Inc. v. United States,* 22 Cl.Ct. 19, 25 (1990), *aff'd,* 937 F.2d 624, 1991 WL 112816 (Fed.Cir.1991). That is, where a contract is explicit and its terms unambiguous, the court is not at liberty to search for its meaning beyond the four corners of the instrument itself, and the use of auxiliary tools of contract interpretation, including extrinsic evidence and post-formation circumstances, is impermissible. *Nicholson,* 29 Fed.Cl. at 193–94; *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 27 Fed.Cl. 275, 290 (1992). Notwithstanding the parol evidence rule, however, extrinsic evidence may be used for the limited purpose of shedding light on the parties' objective intent by clarifying the circumstances affecting a contract or the meaning of terms found within the four corners of the contract itself. *See Kmart Corp. v. United States,* 31 Fed.Cl. 677, 681 (1994). Yet contract interpretation, with or without extrinsic evidence, may never be used to discern or confirm the unilateral subjective intent of one or more of the parties. *Alaska American Lumber Co. v. Unit-*

ed States, 25 Cl.Ct. 518, 528 (1992); *see E.I. Du Pont De Nemours and Co. v. United States,* 24 Cl.Ct. 635, 638 (1991).

Huna Totem would have this court conclude from an examination of the circumstances surrounding contract negotiation and formation that the recalculation clause found in Supplements 1 and 2 provided that if the Forest Service decided not to build the Whitestone Harbor LTF, then the entire Whitestone tributary area would become tributary to the cost share system, changing the basis for the cost share calculation by more than 25%. In this case, the extrinsic evidence plaintiff points to is inconsistent with the plain meaning of the cost share agreement. The negotiations and preliminary plans regarding the Whitestone Harbor LTF shed light only on Huna Totem's subjective motivations and expectations under the contract. If plaintiff indeed interpreted the recalculation clause in this way, its understanding is in error. The extrinsic evidence plaintiff believes to be illuminative of the true interpretation of the cost share recalculation clause merely deals with the parties' pre-formation negotiations. During these negotiations, Huna Totem's representatives knew that the Forest Service might not proceed with the Whitestone Harbor LTF but, nonetheless, signed the cost share agreements. *Def.'s Mot. for Summary Judgment* at App. 524 (Letter from Huna Totem's President to Board of Directors). If Huna Totem was under the impression that under the terms of the agreement a recalculation would automatically ensue should the Forest Service not construct the Whitestone Harbor LTF and yet proceeded with contract formation despite this contrary information, its understanding of the contract was grossly incorrect, and its entry into the contract was imprudent. At the least, Huna Totem should have bargained to have a prophylactic provision incorporated into Section 4 of Supplements 1 and 2 to provide for a recalculation under such circumstances. Rather than doing so, plaintiff now contends that "[t]he *extrinsic* facts necessary to interpret the

---

**2.** While plaintiff urges the court to consider extrinsic evidence reproduced in the Appendix to Plaintiff's *Opp'n to and Cross–Mot. for Summary Judgment,* the court notes that plaintiff included

copies of neither the master agreement nor the supplements, which lie at the heart of the present dispute, in its opposition and cross-motion.

contract are unambiguous upon the dispositive issue in the case." *Pl.'s Opp'n to & Cross–Mot. for Summary Judgment* at 20 (emphasis added). Contrary to plaintiff's contentions, the court does not believe that a reasonably prudent contractor, "objectively viewing the facts and the language of the recalculation clause would have determined that at least a significant portion of the Whitestone Harbor Tributary Area was now tributary to the cost share system and that a recalculation of shares should occur." *See id.* at 18. The extrinsic evidence presented is unavailing to plaintiff's case. The cost share agreement indicates that, in order for there to be a cost share recalculation, a determination must have been made by the Forest Service to change the tributary area used as the basis of cost sharing by more than 25% and that such a determination is to be measured in only one way—according to the MMBF hauled over cost share roads.

### C. Ambiguity

The government argues that Huna Totem's interpretation of the cost share agreement is unreasonable and gives rise to a patent ambiguity. In its opposition and cross-motion, plaintiff asserts that any and all ambiguities in the contract are latent and must be interpreted against the Forest Service via the doctrine of contra proferentem. Whether a contract is ambiguous *ab initio* is a separate issue from whether it would be rendered ambiguous by a party's strained interpretation.

 A contract that is imprecise or indefinite may be deemed defectively formed and, therefore, unenforceable for ambiguousness as a matter of law. *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993). Courts will not read an ambiguity into a contract term if reading the contract as a whole or interpreting the contract language will provide an unambiguous meaning. *International Transducer Corp. v. United States,* ·30 Fed.Cl. 522, 530 (1994). Courts are loathe to find ambiguity where the terms of the contract can be brought into harmony by a plain meaning interpretation rather than conflict by a strained interpretation. *Nicholson v. United States,* 29 Fed.Cl.

180, 189–90 (1993). Further, an interpretation that yields an ambiguity at the cost of rendering other terms "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result" must be avoided. *See Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed. Cir.1991).

 Disagreement between the parties over the meaning of a contract's terms is not necessarily probative of ambiguity, *Seaboard Lumber Co. v. United States,* 19 Cl.Ct. 310, 315 (1990), whereas the presence of a genuine dispute as to how contract language could be read, if reasonable, may indicate contract ambiguity. *Hills Mat'ls Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1982). Indeed, ambiguity exists only when the parties to a contract proffer two reasonable, irreconcilable interpretations to contract language. "It is a generally accepted rule ... that if a contract is reasonably susceptible of more than one [reasonable] interpretation, it is ambiguous." *Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir.1986). More recently, the Federal Circuit has stated, "Although a disagreement as to the meaning of a contract term does not of itself render the term ambiguous ... if more than one meaning is reasonably consistent with the contract language it can not be deemed unambiguous." *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir.1993) (citations omitted).

 The relevant sections of the cost share agreement in the case at bar are not ambiguous. The terms clearly outline the parties' rights, responsibilities, and liabilities under the contract, and there is no inconsistency to be found, whether patent or latent. None of the terms found in Section 4 of the agreement are used in ways unfamiliar to the parties, the grammatical structure does not lend itself to confusion or equivocality, and the parties' performance under the contract is clear. The relevant portions of the cost share agreement set forth the requirements necessary to trigger a recalculation, i.e., there must have been: (1) a governmental determination that, (2) the tributary area used as the basis for cost calculation has changed by more than 25%, and (3) this determination occurred within the three-year

window of September 10, 1982–1985. The plain meaning rule of contract interpretation, as applied here, requires that the cost share calculation be based on the amount of timber hauled, not the geographic size of the potentially includable tributary area. This is the meaning a reasonably prudent, similarly situated contractor would give the cost share agreement, and this is the meaning attributed to it by the court. Examining the circumstances surrounding contract formation and the objectively manifested intent of the parties, this is the only reasonable interpretation of the recalculation clause. In order to find that Section 4 of the cost share agreement is ambiguous, the court would have to impermissibly manipulate the contract language. The only place an ambiguity or inconsistency lurks is between plaintiff's subjective expectancies and the language of the contract the parties negotiated, reduced to writing, and signed. Accordingly, the road right-of-way construction and use cost share agreement is not ambiguous, and there is no defect in contract formation.[3]

## II. Breach of Contract

Plaintiff claims that the Forest Service's failure to construct an LTF at Whitestone Harbor and its use of cost share roads to transport timber originating from the Whitestone tributary area give rise to defendant's breach. However, Huna Totem's claims for breach of contract stem from plaintiff's mistaken interpretation of the language of the cost share agreement. Having ascertained the proper interpretation of the cost share agreement at issue, the court turns to the contract provisions to determine the merits of plaintiffs' claims for breach of contract.

### A. Breach of the Cost Share Agreement

The stated purpose of the cost share agreement between Huna Totem and the Forest Service indicates that:

[T]he parties have need for establishing access roads to their intermingled landownerships for managing, protecting, and utilizing resources therefrom; and WHEREAS, Government and Cooperator [Huna Totem] desire to join in developing and maintaining such roads serving their ownerships and to share costs thereof; NOW THEREFORE, in consideration of the mutual benefits to be derived, the parties agree as hereinafter set forth.

*Master Agreement* at 1. Pursuant to this agreement, the total amount of timber hauled from the relevant Long Island tributary area used as a basis for cost calculation was approximately 340 MMBF. Plaintiff has failed to contest evidence submitted by the Forest Service that the entire amount of timber actually hauled from the Whitestone tributary area over cost share roads through May 18, 1989, totalled approximately 63 MMBF, and that no Whitestone timber was hauled during the September 10, 1982–1985 period. Thus, the total amount of timber hauled from the Whitestone tributary area over cost share roads through May 18, 1989, constituted less than 18.6% of the total amount of timber hauled from the relevant tributary area. Not only does this time frame far exceed the three-year window provided by the cost share agreement, but also the percentage of change falls short of the 25% necessary to trigger a recalculation pursuant to Section 4. Further, no determination was ever made by the Forest Service to change the timber hauling arrangement until the spring of 1989 when the Forest Service decided to construct an LTF at False Bay in the Whitestone tributary area. This determination came as the result of a settlement agreement in another, unrelated litigation matter.

Plaintiff states:

---

**3.** The parties disagree on the applicability of the doctrine of contra proferentem and the duty to inquire. Huna Totem argues that the risk of unfavorable contract interpretation should be placed on the party who drafted and proffered the allegedly latently ambiguous contract provisions via the doctrine of contra proferentem. *See United States v. Seckinger*, 397 U.S. 203, 216, 90 S.Ct. 880, 887, 25 L.Ed.2d 224 (1970); *United Internat'l*, 33 Fed.Cl. at 370; CIBINIC & NASH,

ADMINISTRATION 220–21 (3d ed. 1995). Defendant argues that the non-drafter has a duty to inquire into patently ambiguous contract terms, regardless of the reasonableness of the non-drafter's interpretation. *See Reliable Bldg.*, 31 Fed.Cl. at 644. The court's determination that the contract is not ambiguous, much less patently ambiguous, obviates these arguments concerning contra proferentem and the duty to inquire. This issue, then, is academic.

Huna Totem Corporation construed the language to mean if the Forest Service did not build a Terminal transfer facility (or LTF) at Whitestone, the area that would have been tributary to the LTF at Whitestone would become tributary to the cost share system.

\*　　\*　　\*　　\*　.　\*　　\*

[B]etween September 10, 1982 and September 10, 1985, □ the Forest Service knew that it was not going to be able to construct an economically viable LTF at Whitestone Harbor and, as a result, timber areas with volumes in excess of 25% of the original cost share areas that were part of the Whitestone Tributary area, as defined by the cost share agreement, were now tributary to the cost share system.

*Pl.'s Opp'n to & Cross-Mot. for Summary Judgment* at 5. Plaintiff's theory of breach flows from its interpretation of the contract provisions and is plagued by a non sequitur. Huna Totem assumes that all "timber areas with volumes in excess of 25% of the original cost share areas" would automatically be included in the cost share basis calculation if the Whitestone Harbor LTF were not constructed. The flaw in plaintiff's interpretation of the recalculation clause is that the Forest Service's failure to build the Whitestone Harbor LTF does not necessarily mean that the tributary used as the basis for cost sharing would actually change by more than 25%. *A fortiori*, not building that LTF did not mean that the Forest Service would make any determination to change the tributary area used as the basis of cost sharing by more than 25%. Nowhere in the contract is there any suggestion that the parties' cost share agreement was conditioned on defendant's construction of an LTF at Whitestone Harbor or that failure to construct such an LTF would precipitate the incorporation of the Whitestone tributary area into the cost share basis. Indeed, the contract does not so much as mention LTFs or the proposed Whitestone Harbor project. The contract addresses only the calculation and method of payment for excess costs incurred based on the volume of timber, expressed in MMBF, hauled over cost share roads. Accordingly, the Forest Service's failure to build the LTF

anticipated by Huna Totem did not constitute a breach of contract.

## B. Breach of the Implied Duty of Good Faith and Fair Dealing

 Plaintiff accuses the Forest Service of violating its implied duty of good faith and fair dealing by failing to inform Huna Totem of the status of the Whitestone Harbor LTF before September 10, 1985. "The specific intent element necessary for bad faith is found in the [Forest Service's] motivation to save the time and expense of a reallocation of the costs." *Pl.'s Opp'n to & Cross-Mot. for Summary Judgment* at 36. Defendant claims that plaintiff has failed to meet its burden of showing violation of this duty. Indeed, Huna Totem must show "well nigh irrefragable proof" of bad faith to prevail upon such a claim and overcome the presumption that the government and its agents acted in good faith. *SMS Data Prods. Group, Inc. v. United States,* 19 Cl.Ct. 612, 618 (1990). Bad faith is characterized by malice or the specific intent to injure. *Id.* The implied duty of good faith and fair dealing imposes well-established responsibilities on contracting parties in the government procurement context. This duty bears· two aspects equally applicable to both parties. First, both parties have the duty not to interfere with or hinder performance in any way, whether actively or through abuse of discretion. *Fuller Co. v. United States,* 108 Ct.Cl. 70, 94, 69 F.Supp. 409, 411 (1947). Second, both parties have a duty to cooperate through affirmative acts or disclosures where fundamental to contract performance. *Miller Elevator Co. v. United States,* 30 Fed.Cl. 662, 674–75 (1994). While there is a presumption that both parties have fulfilled their duties of good faith and fair dealing, violation of either form of this duty constitutes breach of contract. *Id.;* 108 Ct.Cl. 70, 95, 69 F.Supp. 409, 412.

 In the present case, the duties and expectancies plaintiff claims have been circumvented by defendant are not contained within the four corners of the cost share agreement. In fact, despite plaintiff's strenuous urging to the contrary, nowhere did the parties agree that the entire road right-of-

way construction and use cost share agreement was premised on the construction of the Whitestone Harbor LTF. Even before the parties signed Supplement 1 to the master agreement, Huna Totem had information that indicated that the Forest Service might abandon the Whitestone Harbor LTF project. In a letter to Huna Totem's board of directors, Huna Totem's president, John Hinchman, Jr., wrote, "This cost share supplement [Supplement 1] is based on the assumption that two Log Transfer facilities are to be constructed, Long Island and Whitestone. The government is considering dropping Whitestone." *Def.'s Mot. for Summary Judgment* at App. 524. Despite this information, Huna Totem went ahead and signed the cost share agreement with the Forest Service. Further, the Forest Service pursued permit approval for the construction of the Whitestone Harbor LTF, entered into an LTF design contract with the engineering firm of Peratrovich & Nottingham, Inc., and allocated funds for such an LTF. During this process, however, the Forest Service never made a determination that increased the Long Island tributary area by more than 25%. Although Huna Totem assumed that the Whitestone Harbor LTF would be built and that a recalculation of shares would automatically ensue if the LTF were not built, these expectancies were subjective and were not reflected by the objectively manifested intent of the parties. It defies reason for plaintiff to argue that they materially relied on the Forest Service's construction of the Whitestone Harbor LTF in signing the cost share agreement when Huna Totem failed to bargain for the inclusion of this expectation in the contract and knew that that LTF might never be built. Plaintiff's hypothesis that the Forest Service's belief that it could not construct the Whitestone Harbor LTF was the equivalent of an actual determination to include the entire Whitestone tributary area in the Long Island tributary rings hollow. An objective reading of the contract clearly indicates that recalculation requires a determination to change the volume of hauled timber by at least 25%. Plaintiff has

offered no evidence that there was any such change, much less any such determination.

Huna Totem also contends that the Forest Service knew that funding was not available for the Whitestone Harbor LTF project but failed to inform Huna Totem of this fact. Huna Totem does not take into account, however, that notwithstanding the removal of appropriated funds as the primary source of financing, the Forest Service never abandoned the LTF project as it had made arrangements with APC to finance the project through purchaser credits. The Forest Service actually delayed the construction of the Whitestone Harbor LTF for two, unrelated reasons. First, in December 1984, the Forest Service decided to prepare a small independent timber sale in the Suntaheen drainage (within the Whitestone tributary area) and to haul 10 MMBF therefrom over cost share roads to the Long Island LTF. The Forest Service immediately apprised Huna Totem of this sale. Huna Totem not only agreed to include this volume of timber as an estimate of the Forest Service's anticipated use of the cost share roads being negotiated in Supplement 3 to the master agreement, but also, and perhaps more importantly, agreed to a clause in Supplement 3 excluding this 10 MMBF volume from the 25% change in tributary area cost share basis.[4] The second reason for the Forest Service's delay of the Whitestone Harbor LTF was an agreement between APC and the Forest Service that resulted in APC not harvesting any timber from the Whitestone tributary area until 1987. As part of an out of court settlement, the Forest Service did ultimately construct an LTF in the Whitestone tributary area at False Bay and deferred construction of the Whitestone Harbor LTF. Plaintiff has not met its burden of showing with well nigh irrefragable proof that the Forest Service acted with malice or the specific intent to injure. *See SMS Data Prods.*, 19 Cl.Ct. at 618. Therefore, neither party violated its implied duty of good faith and fair dealing.

## CONCLUSION

The court concludes that the Forest Service's decision not to build the Whitestone

---

4. Supplement 3 provides for the construction of a 1.69 mile road segment across Huna Totem land connecting a road system between the Whitestone and Long Island tributary areas.

Harbor LTF did not automatically, inevitably or contractually trigger the inclusion of the entire Whitestone tributary area within the tributary area to be used as the basis of cost share determination under the terms of the cost share agreement. Indeed, the agreement unambiguously indicates that cost shares and calculations were to be based on the volume of timber hauled over cost share roads rather than the geographic area potentially encompassed by the cost share agreement. To hold otherwise would result in an unjustified modification of the agreement to accommodate plaintiff's subjective intentions, flawed assumptions, and contractual misunderstandings. Moreover, the evidence shows that the parties were in agreement as to the basis for the cost share calculation prior to the Forest Service's decision not to build the Whitestone Harbor LTF. Plaintiff was aware that by not building this proposed LTF, defendant would not automatically trigger a cost share recalculation. The court finds as a matter of law that the Forest Service did not breach the agreement or its implied duty of good faith and fair dealing.

Therefore, after careful consideration of the oral testimony, exhibits, arguments, and the applicable law, the court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment pursuant to RCFC 56(c). The Clerk of the Court shall enter judgment accordingly. No costs.

**IT IS SO ORDERED.**